154 T.C. No. 10

UNITED STATES TAX COURT

OAKBROOK LAND HOLDINGS, LLC, WILLIAM DUANE HORTON, TAX
MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5444-13.                     Filed May 12, 2020.

In 2008 P donated a conservation easement to a qualified or-
ganization and claimed a charitable contribution deduction under
I.R.C. sec. 170(a). The easement deed provided that, if the conser-
vation restriction were extinguished at some future date, the donee
would receive a share of the proceeds equal to the fair market value
of the easement on the date the contribution was made. The deed
further provided that the donee's share as thus determined would be
reduced by the value of any improvements made by the donor after
granting the easement. R disallowed the deduction, contending
(among other things) that the extinguishment clause violated the
requirements of sec. 1.170A-14(g)(6), Income Tax Regs.

In Oakbrook Land Holdings, LLC v. Commissioner, T.C.
Memo. 2020-54, issued concurrently with this Opinion, the Court
holds that the easement deed violates the "protected in perpetuity"
requirement of I.R.C. sec. 170(h)(5), as interpreted in sec.
1.170A-14(g)(6), Income Tax Regs., because the donee's share of the

extinguishment proceeds (1) is based on a fixed historical value rather than a proportionate share, and (2) is reduced by the value of any improvements made by the donor. This Opinion addresses petitioner's challenge to the validity of the regulation.

Held: Sec. 1.170A-14(g)(6), Income Tax Regs., was properly promulgated and is valid under the Administrative Procedure Act, 5 U.S.C. sec. 553 (2018).

Held, further, the construction of I.R.C. sec. 170(h)(5) as set forth in sec. 1.170A-14(g)(6), Income Tax Regs., is valid under Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984).

David M. Wooldridge, Michelle A. Levin, Ronald A. Levitt, and Gregory P. Rhodes, for petitioner.

W. Benjamin McClendon, Bruce K. Meneely, Robert W. Dillard, and William W. Kiessling, for respondent.

LAUBER, Judge: Oakbrook Land Holdings, LLC (Oakbrook), purchased 143 acres of land near Chattanooga, Tennessee, in December 2007 for $1,700,000. In December 2008, slightly more than one year later, Oakbrook donated a conservation easement over a portion of the tract to the Southeast Regional Land Conservancy (SRLC). On its Federal income tax return for 2008, Oakbrook claimed for this donation a charitable contribution deduction of $9,545,000. Oakbrook thus

took the position that the land covered by the easement had appreciated in value by about 700% in a single year during the worst real estate crisis to hit the United States since the Great Depression.

The case was tried before Judge Holmes in 2016, and the facts are stated more fully in a separate Memorandum Opinion authored by him and filed concurrently herewith.  Oakbrook Land Holdings, LLC v. Commissioner, T.C. Memo. 2020-54.  That opinion holds that the easement Oakbrook granted did not satisfy the "protected in perpetuity" requirement of section 170(h)(5)(A) and section 1.170A-14(g)(6), Income Tax Regs.[1]  That is because the donee's share of the proceeds, in the event the property were sold following a judicial extinguishment of the easement, would be (1) determined according to a fixed historical value rather than a proportionate share of the proceeds and (2) reduced by the value of any improvements made by the donor.  See Oakbrook Land Holdings, LLC, T.C. Memo. 2020-54, at *36-*37.  In this Opinion we address and reject petitioner's challenge to the validity of this regulation.

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code (Code) in effect for the year at issue.  We round most monetary amounts to the nearest dollar.

FINDINGS OF FACT

In December 2008 Oakbrook executed a Conservation Easement and Declaration of Restrictions and Covenants (Deed) with SRLC, a "qualified organization" under section 170(h)(3). This easement covered 106 acres (or 75%) of the tract Oakbrook had purchased the previous December. The parties understood that changed circumstances might make it impossible, at some point in the future, to continue protecting the conservation area. Should that happen, article VI, section B(2), of the Deed governed how Oakbrook and SRLC would divide the proceeds of sale following a judicial extinguishment of the easement. It provided:

> This Conservation Easement gives rise to a real property right and interest immediately vested in SRLC. For purposes of this Conservation Easement, the fair market value of SRLC's right and interest shall be equal to the difference between (a) the fair market value of the Conservation Area as if not burdened by this Conservation Easement and (b) the fair market value of the Conservation Area burdened by this Conservation Easement, as such values are determined as of the date of this Conservation Easement, (c) less amounts for improvements made by * * * [Oakbrook] in the Conservation Area subsequent to the date of this Conservation Easement, the amount of which will be determined by the value specified for these improvements in a condemnation award in the event all or part of the Conservation Area is taken in exercise of eminent domain * * * . If a change in conditions makes impossible or impractical any continued protection of the Conservation Area for conservation purposes, the restrictions contained herein may only be extinguished by judicial proceeding. Upon such proceeding, SRLC, upon a subsequent sale, exchange or involuntary conversion of the Conservation Area, shall

be entitled to a portion of the proceeds equal to the fair market value
of the Conservation Easement as provided above.

In the event all or part of the conservation area were taken by eminent domain "so as to abrogate the restrictions imposed by this Conservation Easement, * * * [the] proceeds shall be divided in accordance with the proportionate value of SRLC's and * * * [Oakbrook's] interests as specified above." Deed art. VI, sec. B(3).

Oakbrook timely filed a Form 1065, U.S. Return of Partnership Income, for its 2008 taxable year. On that return it claimed a charitable contribution deduction of $9,545,000 for its donation of the easement. The Internal Revenue Service (IRS) selected Oakbrook's return for examination. On December 6, 2012, the IRS issued Oakbrook's tax matters partner (TMP or petitioner) a notice of final partnership administrative adjustment that disallowed the charitable contribution deduction in full. The TMP timely petitioned for readjustment of the partnership items.

Trial was held before Judge Holmes in Birmingham, Alabama, in 2016. At trial the Court heard testimony from the SRLC representative who had drafted the Deed. In post-trial briefs petitioner contended that (1) the extinguishment provision of the Deed complies with the requirements of section 1.170A-14(g)(6), Income Tax Regs., and (2) in the alternative, the regulation is invalid.

Judge Holmes interpreted the Deed to mean that, in the event of a sale following judicial extinguishment of the easement, SRLC's share of the proceeds would be limited to the "initial fixed value" of the easement, i.e., its fair market value (FMV) on the date it was granted. Oakbrook Land Holdings, LLC, T.C. Memo. 2020-54, at *35. The donee's proceeds as thus determined would then be reduced by the value (as specified in any future condemnation award) of any improvements that Oakbrook had made to the conservation area after donating the easement. Ibid. Thus, if property values rose after that date, SRLC's share would not "be protected from inflation either in local land prices or the economy more generally." Id. at *35-*36. Conversely, if property values fell, SRLC might not receive even the initial fixed value of the easement because of the reduction for improvements. Id. at *36.

The Court concluded that the Deed, as thus construed, failed to satisfy the requirements of section 1.170A-14(g)(6), Income Tax Regs., for two reasons. First, the regulation requires that the donee be entitled to a proportionate share of the proceeds, not to a fixed dollar amount keyed to the easement's initial value. Oakbrook Land Holdings, LLC, T.C. Memo. 2020-54, at *37. Second, the regulation does not permit a reduction of the donee's proceeds on account of improvements made by the donor. Id. at *37-*38 (citing PBBM-Rose Hill, Ltd. v.

Commissioner, 900 F.3d 193, 208 (5th Cir. 2018)). In this Opinion we address petitioner's challenge to the validity of this regulation.

OPINION

A.    Statutory and Regulatory Framework

Section 170(a)(1) allows a deduction for any charitable contribution made within the taxable year. If the taxpayer makes a charitable contribution of property other than money, the amount of the contribution is generally equal to the FMV of the property at the time the gift is made. See sec. 1.170A-1(c)(1), Income Tax Regs.

The Code generally restricts a taxpayer's charitable contribution deduction for the donation of "an interest in property which consists of less than the taxpayer's entire interest in such property." Sec. 170(f)(3)(A). But there is an exception to this rule for a "qualified conservation contribution." Sec. 170(f)(3)(B)(iii). This exception applies where: (1) the taxpayer makes a contribution of a "qualified real property interest," (2) the donee is a "qualified organization," and (3) the contribution is "exclusively for conservation purposes." Sec. 170(h)(1).

Section 170(h)(5)(A) provides that a contribution will not be treated as being made exclusively for conservation purposes "unless the conservation purpose is protected in perpetuity." The regulation interpreting this provision recognizes

that "a subsequent unexpected change in the conditions surrounding the [donated] property * * * can make impossible or impractical the continued use of the property for conservation purposes." Sec. 1.170A-14(g)(6)(i), Income Tax Regs. Despite that possibility "the conservation purpose can nonetheless be treated as protected in perpetuity if the restrictions are extinguished by judicial proceeding" and the easement deed ensures that the charitable donee, following sale of the property, will receive a proportionate share of the proceeds and use those proceeds consistently with the conservation purposes underlying the original gift. Ibid. In effect, the "perpetuity" requirement is deemed satisfied because the sale proceeds replace the easement as an asset deployed by the donee "exclusively for conservation purposes." Sec. 170(h)(5)(A).

Section 1.170A-14(g)(6)(i), Income Tax Regs., provides that the donee must be entitled to proceeds "determined under paragraph (g)(6)(ii)." That paragraph, captioned "Proceeds," provides in part as follows:

> [F]or a deduction to be allowed under this section, at the time of the gift the donor must agree that the donation of the perpetual conservation restriction gives rise to a property right, immediately vested in the donee organization, with a fair market value that is at least equal to the proportionate value that the perpetual conservation restriction at the time of the gift, bears to the value of the property as a whole at that time. * * * For purposes of this paragraph * * * , that proportionate value of the donee's property rights shall remain constant. Accordingly, when a change in conditions give[s] rise to the extinguish-

ment of a perpetual conservation restriction under paragraph (g)(6)(i) of this section, the donee organization, on a subsequent sale, exchange, or involuntary conversion of the subject property, must be entitled to a portion of the proceeds at least equal to that proportionate value of the perpetual conservation restriction, unless state law provides that the donor is entitled to the full proceeds * * * .

This regulation requires that the easement deed guarantee the donee "a proportionate share of extinguishment proceeds." Carroll v. Commissioner, 146 T.C. 196, 219 (2016); see PBBM-Rose Hill, 900 F.3d at 207 ("[T]he 'proportionate value' is a fraction equal to the value of the conservation easement at the time of the gift, divided by the value of the property as a whole at that time."). Further, the regulation does not permit that "any amount, including that attributable to improvements, may be subtracted out" of the proceeds against which the proportionate value is applied. PBBM-Rose Hill, 900 F.3d at 208; accord, Coal Prop. Holdings, LLC v. Commissioner, 153 T.C. 126, 136-137 (2019).

B.    Regulatory Background

The Tax Reform Act of 1969, Pub. L. No. 91-172, sec. 201, 83 Stat. at 556, generally disallowed charitable contribution deductions for gifts of partial interests in property. In 1980 Congress revised the Code to allow deductions for such gifts when they constitute "qualified conservation contributions." See Tax Treatment Extension Act of 1980 (1980 Act), Pub. L. No. 96-541, sec. 6, 94 Stat. at 3206

(adding section 170(h)).  Congress specified numerous requirements for a "quali-fied conservation contribution," including the requirements that the contribution be made "exclusively for conservation purposes" and that the "conservation pur-pose [be] protected in perpetuity."  Ibid. (codified at section 170(h)(1)(C), (5)(A)).

On May 23, 1983, the Department of the Treasury (Treasury) issued a notice of proposed rulemaking with "proposed regulations relating to contributions of partial interests in property for conservation purposes."  48 Fed. Reg. 22940 (May 23, 1983).  The preamble explained the history of congressional enactments in this area, highlighting the requirement that a donated easement "be perpetual in order to qualify for a deduction."  Ibid.  Treasury noted that the House and Senate com-mittee reports accompanying the 1980 Act had "provided, for the first time, an in-depth statement of congressional intent concerning the donation of partial interests for conservation purposes."  Ibid.  The preamble stated that the proposed regula-tions "reflect the major policy decisions made by the Congress and expressed in these committee reports."  Ibid.

The proposed regulations spanned nine pages of the Federal Register and included provisions--many quite technical--addressing concepts such as "qualified real property interest," "perpetual conservation restriction," "historically important land area," "certified historic structure,"  "conservation purpose," and "significant

public benefit." Id. at 22941-22949. Overall, the proposed regulations covering "qualified conservation contributions" consisted of 10 paragraphs, 23 subparagraphs, 30 subdivisions, and 21 examples. One of these 23 subparagraphs became what is now section 1.170A-14(g)(6), Income Tax Regs., covering judicial extinguishment of easements and allocation of the resulting proceeds. 48 Fed. Reg. at 22946.

In response to its request for public comments, Treasury received more than 700 pages of commentary. Ninety organizations or individuals submitted comments addressing various aspects of the proposed rules. Of the 90 commenters only 13 mentioned the judicial extinguishment provision. Of those 13 most devoted only a few sentences to this subject, generally at the end of a submission that emphasized other matters.

Most of the commenters who mentioned the judicial extinguishment provision supported it. The Maine Coast Heritage Trust "strongly endorse[d] the proposed provisions for extinguishing easements." Other commenters echoed this point, emphasizing that the proportionate value assigned to the easement should be "the minimum that a grantee organization should receive." Several commenters recommended that the proceeds formula be revised to make it more favorable to

the donee, such that the donee's share would be "equal to the <u>greater</u> of its original proportionate value or its proportionate value at the time of the extinguishment."

Some commenters who supported the judicial extinguishment rule suggested minor tweaks to it. The National Trust for Historic Preservation recommended "including 'refinancing' in the list of events that would trigger the property owner's obligation to pay the easement holder for the value of its extinguished easement rights." The Washington Trust for Historic Preservation recommended that the list of triggering events, rather than being expanded, should be restricted to "'acts of God' which substantially destroy the property." The Natural Lands Trust recommended that the fraction determining the donee's share be computed on the basis of values existing "at the time of the extinguishment."

Several commenters suggested that the judicial extinguishment rule might be unnecessary or difficult to enforce against future owners. Two commenters noted concern that donors or donees mfight be subject to State transfer taxes upon distribution of extinguishment proceeds. Three commenters questioned the "proportionate value" approach as applied to facade easements on certified historic structures, while agreeing that this approach was appropriate "as applied to open space easements" on land.

Two commenters were definitely opposed to the judicial extinguishment rule, fearing that it would "create a potential disincentive to the donation of easements." According to the Landmarks Preservation Council of Illinois, the "proportionate value" approach to distribution of proceeds was problematic as applied to facade easements on "endangered historic properties * * * in downtown commercial areas." The New York Landmarks Conservancy (NYLC), which was "dedicated to the preservation of architecturally, historically and culturally significant buildings," devoted two pages of comments to the judicial extinguishment rule, focusing its concern on the supposed "deterrent effect" of this provision. Noting that judicial extinguishment was a "relatively remote" possibility, it questioned whether the regulations needed to address this point.

NYLC was the only commenter to mention donor improvements to the conservation area. It urged that the proportionate value formula "fails to take into account that improvements may be made * * * by the owner which should properly alter the ratio." It contended that failure to offset improvements against the donee's share of the proceeds "would obviously be undesirable to the prospective donor and would constitute a windfall to the donee organization." But NYLC suggested no alternative text to address this concern, other than to "recommend

deletion of the entire extinguishment provision." Nor did any other commenter suggest alternative text to address the concerns (if any) that it expressed.

A public hearing on the proposed amendments to the regulations was held on September 15, 1983. On January 14, 1986, Treasury adopted the proposed amendments with numerous revisions. See T.D. 8069, 1986-1 C.B. 89. The preamble to the final regulations provides a summary of the law and states that, "[a]fter consideration of all comments regarding the proposed amendments * * * , those amendments are adopted as revised by this Treasury decision." Id. at 90.

In a section captioned "Summary of Comments," the preamble explained that Treasury had made substantial revisions in response to the comments it received. The preamble discussed seven aspects of the proposed regulations in detail; in each case Treasury revised or clarified text, filled in gaps, or provided additional explanatory examples. Id. at 90-91. Several of these provisions had generated "many comments." Ibid.

The "judicial extinguishment" provision is not among the amendments specifically addressed in the "Summary of Comments." However, Treasury did make changes to that provision in response to the comments it received. As originally proposed, the "judicial extinguishment" rule vested the donee with a property right having an FMV "that is a minimum ascertainable proportion of the fair market

value to the entire property." 48 Fed. Reg. at 22946. The final regulation revised subparagraph (6)(ii) to refer to a property right with an FMV "that is at least equal to the proportionate value that the perpetual conservation restriction at the time of the gift, bears to the value of the property as a whole at that time." Sec. 1.170A-14(g)(6)(ii), Income Tax Regs.; see T.D. 8069, 1986-1 C.B. at 99. Treasury concurrently made three other technical and conforming changes to the text of this provision.

These changes to the "judicial extinguishment" rule responded to comments that Treasury had received from the Nature Conservancy, the Maine Coast Heritage Trust, the Brandywine Conservancy, and the Land Trust Exchange. (The Land Trust Exchange had synthesized comments from land trusts across the country.) These commenters urged that "the proportionate value, not the absolute value, * * * is the important figure," and that "the proportionate value assigned to an easement at the time of gift is the minimum that a grantee organization should receive in the event of an extinguishment and sale."

C.    Procedural Validity of the Regulation

Petitioner first contends that the judicial extinguishment regulation is procedurally defective on the theory that it was not properly promulgated as required by the Administrative Procedure Act (APA), 5 U.S.C. sec. 553 (2018).

1.     <u>Legislative vs. Interpretive Rules</u>

Administrative law distinguishes between interpretive and legislative agency rules. "An interpretive rule merely clarifies or explains preexisting substantive law or regulations." <u>SIH Partners LLLP v. Commissioner</u>, 150 T.C. 28, 40 (2018) (citing <u>Elizabeth Blackwell Health Ctr. for Women v. Knoll</u>, 61 F.3d 170, 181 (3d Cir. 1995)), <u>aff'd</u>, 923 F.3d 296 (3d Cir. 2019); <u>see</u> <u>Tenn. Hosp. Ass'n v. Azar</u>, 908 F.3d 1029, 1042 (6th Cir. 2018). A legislative rule, on the other hand, "creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself." <u>SIH Partners</u>, 150 T.C. at 40 (quoting <u>Dia Navigation Co. v. Pomeroy</u>, 34 F.3d 1255, 1264 (3d Cir. 1994)); <u>see</u> <u>Tenn. Hosp. Ass'n</u>, 908 F.3d at 1042. Legislative rules have "the force and effect of law." <u>Chrysler Corp. v. Brown</u>, 441 U.S. 281, 303 (1979) (quoting <u>Batterton v. Francis</u>, 432 U.S. 419, 425 n.9 (1977)).

Section 170(h)(5)(A) requires that the conservation purpose underlying the easement be "protected in perpetuity." But the statute does not indicate how (or whether) this requirement could be deemed satisfied given the possibility that the easement might later be extinguished. The regulation specifies the circumstances in which "the conservation purpose can nonetheless be treated as protected in perpetuity." Sec. 1.170A-14(g)(6)(i), Income Tax Regs.

To secure this treatment the regulation requires that the donor agree, at the time of the gift, to a specified division of proceeds in the event the property is sold following judicial extinguishment of the easement. Ibid. The required division of proceeds is set forth in subparagraph (6)(ii). Because the regulation imposes a requirement not explicitly set forth in the statute, it is appropriately treated as a legislative rule. Cf. SIH Partners, 150 T.C. at 40-41.

2.     Procedural Requirements for Legislative Rules

Legislative rules are subject to APA notice-and-comment rulemaking procedures. See 5 U.S.C. sec. 553(b); Tenn. Hosp. Ass'n, 908 F.3d at 1042. To issue a legislative regulation consistently with the APA an agency must: (1) publish a notice of proposed rulemaking in the Federal Register; (2) provide "interested persons an opportunity to participate * * * through submission of written data, views, or arguments"; and (3) "[a]fter consideration of the relevant matter presented, * * * incorporate in the rules adopted a concise general statement of their basis and purpose." See 5 U.S.C. sec. 553(b) and (c).

The administrative record for T.D. 8069 shows (and petitioner does not dispute) that Treasury satisfied the first two requirements. Petitioner contends that Treasury failed to consider a "relevant matter presented" to it and failed to include in the final regulations a "concise general statement of their basis and purpose."

The APA provides that a reviewing court shall set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. sec. 706(2)(a). The scope of our review "is a narrow one" because "[t]he court is not empowered to substitute its judgment for that of the agency." Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974) (quoting Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)). We consider only whether the agency "articulate[d] a satisfactory explanation for its action." Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co. (State Farm), 463 U.S. 29, 43 (1983).

While we cannot provide a reasoned basis for agency action that the agency itself did not supply, we will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc., 419 U.S. at 285-286. "So long as an agency's rationale can reasonably be discerned and that rationale coincides with the agency's authority and obligations under the relevant statute, a reviewing court may not 'broadly require an agency to consider all policy alternatives in reaching decision.'" SIH Partners, 150 T.C. at 47 (quoting State Farm, 463 U.S. at 51). Indeed, "regulations with no statement of basis and purpose have been upheld where the basis and purpose w[ere] considered obvious." Cal-Almond, Inc. v. U.S. Dep't of Agric., 14 F.3d 429, 443 (9th Cir.

1993) (citing <u>Citizens to Save Spencer Cty. v. EPA</u>, 600 F.2d 844, 884 (D.C. Cir. 1979)).[2]

The preamble to the final regulations explains that they were being promulgated to "provide necessary guidance to the public for compliance with the law," as recently amended by Congress, "relating to contributions * * * of partial interests in property for conservation purposes." T.D. 8069, 1986-1 C.B. at 89. The preamble to the proposed regulations supplied extensive background about the legislative history, explaining that "[t]he regulations reflect the major policy decisions made by the Congress and expressed in the[] committee reports." 48 Fed. Reg. at 22940. Treasury noted that "[t]he most difficult problem posed in this regulation was how to provide a workable framework for donors, donees, and the * * * [IRS] to judge the deductibility of open space easements," inviting public comments on this and other points. <u>Ibid.</u>

---

[2]In <u>State Farm</u> the Supreme Court found agency action arbitrary and capricious because it "failed to present an adequate basis and explanation" of its decision to reverse a longstanding rule. <u>State Farm</u>, 463 U.S. at 34. On the basis of the record in that case, the agency's explanation was "<u>not</u> sufficient to enable * * * [the Court] to conclude that the recission was a product of reasoned decisionmaking." <u>Id.</u> at 52. Here, Treasury was promulgating new rules in response to Congress' amendments to section 170. Treasury was not reversing an earlier policy supported by a body of fact that would require substantial evidence to justify a reversal of course. See <u>SIH Partners</u>, 150 T.C. at 43-44 (distinguishing <u>State Farm</u> on the same ground).

In response to this request Treasury received comments from 90 organizations and individuals who supplied voluminous commentary on many aspects of the proposed regulations. Treasury considered these comments and made numerous changes throughout, highlighting the most important revisions in a two-page "Summary of Comments." T.D. 8069, 1986-1 C.B. at 90-91. The preamble to the final regulations states that, "[a]fter consideration of all comments regarding the proposed amendments * * * , those amendments are adopted as revised by this Treasury decision." Id. at 90. This Court has found a similar statement, coupled with the administrative record, sufficient to find that Treasury had considered the relevant matter presented to it. See Wing v. Commissioner, 81 T.C. 17, 31-32 (1983) (upholding a regulation whose preamble stated that, "[a]fter consideration of all comments regarding the proposed amendments, this Treasury Decision is adopted" (quoting T.D. 7523, 42 Fed. Reg. 63640 (Dec. 19, 1977))).

The preamble to the final regulations discusses seven major groups of comments and the changes Treasury made in response to them. But an agency cannot reasonably be expected to address every comment it received. The APA "has never been interpreted to require the agency to respond to every comment, or to analyse every issue or alternative raised by the comments, no matter how insubstantial." Thompson v. Clark, 741 F.2d 401, 408 (D.C. Cir. 1984). "We do not

expect the agency to discuss every item of fact or opinion included in the submissions made to it." Simms v. Nat'l Highway Traffic Safety Admin., 45 F.3d 999, 1005 (6th Cir. 1995) (quoting Auto. Parts & Accessories Ass'n, Inc. v. Boyd, 407 F.2d 330, 338 (D.C. Cir. 1968)); see Action on Smoking & Health v. Civil Aeronautics Bd., 699 F.2d 1209, 1216 (D.C. Cir. 1983) ("An agency need not respond to every comment.").

The two aspects of the "judicial extinguishment" rule to which petitioner objects are the requirement that the donee receive a proportional share of the proceeds and the fact that the "proportionate share" formula does not account for the possibility of donor improvements. Treasury clearly considered the comments it received on the first point because it substantially revised the text of section 1.170A-14(g)(6)(ii), Income Tax Regs., in response to those comments. See supra pp. 14-15.

Only one of the 90 commenters mentioned donor improvements, and it devoted exactly one paragraph to this subject. That commenter, NYLC, was concerned about facade easements on historic structures, as opposed to "perpetual open space easements," with which Treasury was chiefly concerned. See 48 Fed. Reg. at 22940. And NYLC mentioned this point to support its belief that donors

of facade easements "are likely to be discouraged from making a donation," a supposition that Treasury may reasonably have discounted.

In any event, "[t]he administrative record reflects that no substantive alternatives to the final rules were presented for Treasury's consideration." SIH Partners, 150 T.C. at 44; see dissenting op. p. 102 ("A comment is * * * more likely to be significant if the commenter suggests a remedy for the purported problem it identifies."). NYLC offered no suggestion about how the subject of donor improvements might be handled; it simply recommended "deletion of the entire extinguishment provision." Only one other commenter of the 13 mentioning judicial extinguishment voiced that recommendation.[3]

---

[3]Our dissenting colleague errs in relying on United States v. Nova Scotia Food Prods. Corp., 568 F.2d 240 (2d Cir. 1977), to support his position. See dissenting op. pp. 110-113. That case involved a Food and Drug Administration (FDA) regulation establishing minimum "time, temperature, and salinity" requirements for processing fish. The Second Circuit invalidated the regulation as applied to one category of fish product, "non-vacuum-packed hot-smoked whitefish." Nova Scotia Food Prods. Corp., 568 F.2d at 253. The court first held that the FDA had "failed to disclose to interested parties the scientific data and the methodology upon which it relied." Id. at 250. "When the basis for a proposed rule is a scientific decision, the scientific material which is believed to support the rule should be exposed to the view of interested parties for their comment." Id. at 252. The court also held that the agency had failed to consider: (1) evidence that heating "certain types of fish to high temperatures will completely destroy the product," (2) the suggestion that using "nitrite and salt as additives could safely lower the high temperature otherwise required," and (3) the suggestion that different processing requirements should be established for different species of

(continued...)

The APA requires "consideration of the relevant matter presented" during the rulemaking process. 5 U.S.C. sec. 553(c). Our review of the administrative record leaves us with no doubt that Treasury considered the relevant matter presented to it. See Wing, 81 T.C. at 33. And we find equally little merit in petitioner's assertion that Treasury failed to "incorporate in the rules adopted a concise general statement of their basis and purpose." See 5 U.S.C. sec. 553(c).

The preamble to the final regulations explains that they were being promulgated to "provide necessary guidance to the public for compliance with the law," as recently amended by Congress, "relating to contributions * * * of partial interests in property for conservation purposes." T.D. 8069, 1986-1 C.B. at 89. The preamble to the proposed regulations emphasized the requirement that conservation easements "be perpetual in order to qualify for a deduction." 48 Fed. Reg. 22940. The purpose of the "judicial extinguishment" rule is plain on its face--to provide a mechanism to ensure that the conservation purpose can be deemed

---

[3](...continued)
fish. Id. at 245. Here, the basis for the proposed regulation was not "a scientific decision"; Treasury relied on no undisclosed data when proposing its regulation; the two commenters who opposed the judicial extinguishment rule offered no concrete alternative suggestions; and the concerns they expressed lacked the significance of concerns about destroying the commercial viability of a product, which the Second Circuit aptly described as "vital questions" in Nova Scotia Food Prods. Corp., 568 F.2d at 252.

"protected in perpetuity" notwithstanding the possibility that the easement might later be extinguished. Sec. 1.170A-14(g)(6)(i), Income Tax Regs. Even where a regulation contains no statement of basis and purpose whatsoever, it may be upheld "where the basis and purpose * * * [are] considered obvious." Cal-Almond, Inc., 14 F.3d at 443.

Petitioner insists that Treasury failed to comply with the APA because the preamble to the final regulations did not discuss the "basis and purpose" of the judicial extinguishment provision specifically. But this provision represented one subparagraph of a regulation project consisting of 10 paragraphs, 23 subparagraphs, 30 subdivisions, and 21 examples. No court has ever construed the APA to mandate that an agency explain the basis and purpose of each individual component of a regulation separately. "[T]he detail required in a statement of basis and purpose depends on the subject of the regulation and the nature of the comments received." Reytblatt v. U.S. Nuclear Regulatory Comm'n, 105 F.3d 715, 722 (D.C. Cir. 1997) (quoting Action on Smoking & Health, 699 F.2d at 1216). This statement need only "contain sufficient information to allow a court to exercise judicial review." United States v. Garner, 767 F.2d 104, 117 (5th Cir. 1985); see Simms, 45 F.3d at 1005 (quoting Auto. Parts & Accessories Ass'n, Inc., 407 F.2d at 338).

The broad statements of purpose contained in the preambles to the final and proposed regulations, coupled with obvious inferences drawn from the regulations themselves, are more than adequate to enable us to perform judicial review. We find that Treasury's rationale for the judicial extinguishment rule "can reasonably be discerned and * * * coincides with the agency's authority and obligations under the relevant statute." SIH Partners, 150 T.C. at 47. We accordingly hold that Treasury satisfied all applicable APA requirements when promulgating this rule.[4]

---

[4]Petitioner cites only one case in which a Federal court has invalidated a Treasury regulation on the theory that the regulation was not properly promulgated under the APA. See Dominion Res., Inc. v. United States, 681 F.3d 1313 (Fed. Cir. 2012). That case involved a regulation governing capitalization of interest under section 263A. The Federal Circuit first held the regulation substantively invalid under Chevron step two, concluding that it "directly contradict[ed] the avoided-cost rule that Congress intended the statute to implement." Dominion Res., Inc., 681 F.3d at 1317. The court also held that Treasury did not "provide a reasoned explanation for adopting * * * [the] regulation," thus violating "the State Farm requirement that the regulation must articulate a satisfactory or cogent explanation." Id. at 1319. Since the court found the regulation inconsistent with the statute, it unsurprisingly found that Treasury was obligated to explain why it nevertheless adopted the rule. No such problem exists here: The judicial extinguishment rule is clearly consistent with, and was designed to ensure satisfaction of, the statutory requirement that the conservation purpose be "protected in perpetuity." Sec. 170(h)(5)(C). Petitioner does not allege any inconsistency between the statute and the regulation; rather, it faults Treasury for failing to refine the proceeds formula to make it slightly more favorable to donors in the unlikely event of judicial extinguishment. As explained in the text, only 1 of 90 commenters (NYLC) even mentioned this issue, and its proposed solution was to eliminate the judicial extinguishment rule in its entirety. Treasury did not abuse its discretion in rejecting that option.

D.    Substantive Validity of the Regulation

1.    The "Judicial Extinguishment" Provision Generally

Having concluded that the regulation was properly promulgated, we turn to petitioner's contention that the regulation is substantively invalid.  When considering a challenge to the substantive validity of a regulation, we generally employ the two-part test established by Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984).  The first prong of that test asks "whether Congress has directly spoken to the precise question at issue."  Id. at 842.  "If the intent of Congress is clear, that is the end of the matter."  Ibid.

Section 170(h)(5)(A) sets forth a general requirement that the conservation purpose be "protected in perpetuity."  Congress does not appear to have considered the possibility that an easement might be judicially extinguished, and the statute does not address how that possibility would affect a taxpayer's ability to satisfy the "perpetuity" requirement.  Congress therefore did not speak directly to the question at issue.

We accordingly proceed to Chevron step two, which requires us to consider whether the regulation "is based on a permissible construction of the statute." Chevron, 467 U.S. at 843.  If the statute is silent, we must give deference to the interpretation embodied in the agency's regulation unless it is "arbitrary, caprici-

ous, or manifestly contrary to the statute." Id. at 844; see United States v. Mead Corp., 533 U.S. 218, 227 (2001). In other words we must sustain the regulation so long as it represents a "reasonable interpretation" of the law Congress enacted. Chevron, 467 U.S. at 844; see SIH Partners, 150 T.C. at 50.

Petitioner does not challenge the validity of the "judicial extinguishment" regulation as a whole, and it would be difficult to do so. Treasury faced a conundrum: How could the IRS determine that a conservation purpose was protected in perpetuity, thus enabling the donor to qualify for a deduction in the year he made the gift, when the easement might be extinguished at some future date? The regulation solves this problem by requiring the donor to agree, up front, to divide with the donee any proceeds from a post-extinguishment sale. The "perpetuity" requirement is deemed satisfied because "the donee organization can use its proportionate share of the proceeds to advance the cause of historic preservation elsewhere." Carroll, 146 T.C. at 214 (quoting Kaufman v. Shulman, 687 F.3d 21, 26 (1st Cir. 2012)).

2. Proportionate Value

While not disputing the validity of Treasury's overall objective, petitioner urges that the regulation is unreasonable in two respects. First, petitioner challenges the "proportionate value" approach to division of sale proceeds. Under

section 1.170A-14(g)(6)(ii), Income Tax Regs., the donee's share is determined by multiplying the sale proceeds by a fraction, the numerator of which is the FMV of the easement at the time it was granted, and the denominator of which is the FMV of the entire property at that time. Petitioner contends that Treasury should have capped the donee's share at the FMV of the easement at the time it was granted.

We cannot say that the regulation's "proportionate value" approach is "arbitrary, capricious, or manifestly contrary to the statute." Chevron, 467 U.S. at 844. Under the regulation the donee acquires "a property right, immediately vested in the donee organization," in a share of any future proceeds. Sec. 1.170A-14(g)(6)(ii), Income Tax Regs. Needless to say, the easement might be extinguished many years after it was granted, and considerable inflation in property values might occur in the interim. If the donee's share were limited to the easement's historical FMV, its property right could be eviscerated in real dollar terms. This would allow the donor or its successors to "reap[] a windfall if the property is destroyed or condemned." Carroll, 146 T.C. at 214 (quoting Kaufman, 687 F.3d at 26). That outcome would be at odds with the regulation's central purpose: to ensure satisfaction of the statute's "protected in perpetuity" requirement by supplying the donee with an asset that replaces, in real terms, the easement that has been lost.

3.    Donor Improvements

Second, petitioner contends that the regulation is invalid because it does not permit the donee's share of the proceeds to be reduced by the value of improvements (if any) made by the donor.  The regulation as proposed did not address donor improvements, and only one of 90 commenters mentioned the point.  See supra pp. 21-22.  Once again, we cannot say that the absence of a provision addressing donor improvements renders the regulation "arbitrary, capricious, or manifestly contrary to the statute."  Chevron, 467 U.S. at 844.

Treasury's goal in prescribing this regulation was to ensure satisfaction of the statute's "protected in perpetuity" requirement.  In effect this requirement is deemed satisfied because the sale proceeds replace the easement as an asset deployed by the donee "exclusively for conservation purposes."  Sec. 170(h)(5)(A). In certain factual scenarios, reducing the donee's proceeds on account of donor improvements could frustrate this goal, especially if local land values should decline.

For example, assume that a taxpayer donates an easement valued at $1 million on property valued at $2 million without the easement.  The taxpayer thereafter spends $1 million improving the property.  Many years later, there is an economic downturn, the easement is extinguished, and the property is sold for $2 mil-

lion. Under the regulation the donee would be entitled to $1 million (half of the proceeds) and the conservation purpose would be deemed "protected in perpetuity." Sec. 170(h)(5)(A). But if improvements were carved out, the donee's share would be reduced to $500,000 or zero, depending on whether the carve-out was applied to the entire proceeds or to the donee's 50% share.

NYLC, the only commenter to mention donor improvements, notably did not suggest any text to address this problem. And addressing it would have raised a host of questions: Would the donee's proceeds be reduced by improvements the donor had made before granting the easement, after granting it, or both? Would the donor get credit for improvements to the land itself (such as grading) or only for erecting structures? Would the donee's proceeds be reduced by the donor's cost for the improvements or by their FMV at the time the easement was extinguished? And how would the problem mentioned in the previous paragraph be solved, to prevent the donee's share from being severely reduced or even eliminated? It is conceivable that Treasury could have drafted a regulation that addressed the possibility of donor improvements, dealing with these ancillary questions in some rational way. But that was a policy decision for Treasury, not this Court, to make.

Treasury's overarching goal was to guarantee that the donee, upon judicial extinguishment of the easement, would receive the full share of proceeds to which it was entitled. The few commenters who addressed this point offered differing views on precisely how the donee's "proportionate share" should be determined. NYLC regarded the formula as too favorable to the donee because it did not account for possible donor improvements. Other commenters urged that the formula should be made more favorable to the donee, with the donee's share being "equal to the greater of its original proportionate value or its proportionate value at the time of the extinguishment."

We find that Treasury exercised reasoned judgment by adhering to a simple rule that splits sale proceeds in a direct proportional manner on the basis of a fraction determined as of the date the gift was made. Because the regulation as drafted ensures satisfaction of the statutory mandate that the conservation purpose be "protected in perpetuity," sec. 170(h)(5)(A), we cannot find the regulation to be "arbitrary, capricious, or manifestly contrary to the statute," Chevron, 467 U.S. at 844.

Finally, the age of this regulation gives weight to the presumption of reasonableness. "Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reënacted statutes, are

deemed to have received congressional approval and have the effect of law." <u>Cottage Sav. Ass'n v. Commissioner</u>, 499 U.S. 554, 561 (1991) (quoting <u>United States v. Correll</u>, 389 U.S. 299, 305-306 (1967)). "[A]gency interpretations that are of long standing come before us with a certain credential of reasonableness, since it is rare that error would long persist." <u>Smiley v. Citibank (S.D.), N.A.</u>, 517 U.S. 735, 740 (1996); <u>see</u> <u>Carlebach v. Commissioner</u>, 139 T.C. 1, 12 (2012) (sustaining under <u>Chevron</u> step two a regulation that had "gain[ed] legitimacy" because it had persisted substantially unchanged since 1944).

The regulation petitioner challenges was promulgated in January 1986. It has never been amended. In the past 34 years Congress has amended section 170 more than 30 times,[5] but these amendments have never suggested any

---

[5]<u>See</u> Pub. L. No. 99-514, secs. 142(d), 231(f), 301(b)(2), 1831, 100 Stat. at 2120, 2180, 2217, 2851 (1986); Pub. L. No. 100-203, sec. 10711(a)(1), 101 Stat. at 1330-464 (1987); Pub. L. No. 100-647, sec. 6001(a), 102 Stat. at 3683 (1988); Pub. L. No. 101-508, secs. 11801(a)(11), (c)(5), 11813(b)(10), 104 Stat. at 1388-520, 1388-523, 1388-554 (1990); Pub. L. No. 103-66, secs. 13172(a), 13222(b), 107 Stat. at 455, 479 (1993); Pub. L. No. 104-188, secs. 1206(a), 1316(b), 110 Stat. at 1776, 1786 (1996); Pub. L. No. 105-34, secs. 224(a), 508(d), 602(a), 973(a), 111 Stat. at 818, 860, 862, 898 (1997); Pub. L. No. 105-206, sec. 6004(e), 112 Stat. at 795 (1998); Pub. L. No. 105-277, sec. 1004(a)(1), 112 Stat. at 2681-888 (1998); Pub. L. No. 106-170, secs. 532(c)(1)(A) and (B), 537(a), 113 Stat. at 1930, 1936 (1999); Pub. L. No. 106-554, secs. 1(a)(7), 165(a)-(e), 114 Stat. at 2763, 2763A-626 (2000); Pub. L. No. 107-16, sec. 542(e)(2)(B), 115 Stat. at 84 (2001); Pub. L. No. 107-147, sec. 417(7), (22), 116 Stat. at 56, 57 (2002); Pub. L. No. 108-81, sec. 503, 117 Stat. at 1003 (2003); Pub. L. No. 108-311, secs.

(continued...)

disagreement with the construction of the statute that Treasury adopted in section 1.170A-14(g)(6), Income Tax Regs. This "strongly suggests that * * * [Congress] did not view Treasury's construction * * * as unreasonable or contrary to the law's purpose." SIH Partners, 150 T.C. at 53-54 (sustaining under Chevron step two a regulation that had persisted substantially unchanged for nearly 50 years).

---

[5](...continued)
207(15), (16), 306(a), 118 Stat. at 1177, 1179 (2004); Pub. L. No. 108-357, secs. 335(a), 413(c)(30), 882(a), (b), (d), 883(a), 884(a), 118 Stat. at 1478, 1509, 1627, 1631, 1632 (2004); Pub. L. No. 109-73, secs. 305(a), 306(a), 119 Stat. at 2025 (2005); Pub. L. No. 109-135, sec. 403(a)(16), (gg), 119 Stat. at 2619, 2631 (2005); Pub. L. No. 109-222, sec. 204(b), 120 Stat. at 350 (2006); Pub. L. No. 109-280, secs. 1202(a), 1204(a), 1206(a), (b)(1), 1213(a)(1), (b)-(d), 1214(a) and (b), 1215(a), 1216(a), 1217(a), 1218(a), 1219(c)(1), 1234(a), 120 Stat. at 1066, 1068, 1075, 1077, 1079, 1080, 1085, 1100 (2006); Pub. L. No. 109-432, sec. 116(a)(1), (b)(1) and (2), 120 Stat. at 2941 (2006); Pub. L. No. 110-172, secs. 3(c), 11(a)(14)(A) and (B), (15) and (16), 121 Stat. at 2474, 2485 (2007); Pub. L. No. 110-234, sec. 15302(a), 122 Stat. at 1501 (2008); Pub. L. No. 110-246, secs. 4(a), 15302(a), 122 Stat. at 1664, 2263 (2008); Pub. L. No. 110-343, secs. 321(b), 323(a)(1), (b)(1), 324(a), (b), 122 Stat. at 3873, 3874, 3875 (2008); Pub. L. No. 111-312, secs. 301(a), 723(a) and (b), 740(a), 741(a), 742(a), 124 Stat. at 3300, 3316, 3319 (2010); Pub. L. No. 112-240, secs. 206(a) and (b), 314(a), 126 Stat. at 2324, 2330 (2013); Pub. L. No. 113-295, secs. 106(a) and (b), 126(a), 221(a)(28), 128 Stat. at 4013, 4017, 4041 (2014); Pub. L. No. 114-41, sec. 2006(a)(2)(A), 129 Stat. at 457 (2015); Pub. L. No. 114-113, secs. 111(a)-(b)(2), 113(a) and (b), 331(a), 129 Stat. at 3046, 3047, 3104 (2015); Pub. L. No. 115-97, secs. 11011(d)(5), 11023(a), 13305(b)(2), 13704(a), 13705(a), 131 Stat. at 2071, 2074, 2126, 2169 (2017); Pub. L. No. 115-141, sec. 401(a)(52), (b)(14), 132 Stat. at 1186, 1202 (2018); Pub. L. No. 115-232, sec. 809(h)(1), 132 Stat. at 1842 (2018).

To implement the foregoing,

<u>An appropriate decision will be entered</u>.

Reviewed by the Court.

FOLEY, GALE, THORNTON, PARIS, MORRISON, KERRIGAN, BUCH, NEGA, PUGH, ASHFORD, and COPELAND, <u>JJ</u>., agree with this opinion of the Court.

GUSTAFSON, <u>J</u>., agrees with parts A, B, C, D.1, and D.2 of this opinion.

HOLMES, <u>J</u>., dissents.

TORO, J., concurring in the result:  The question before the Court is whether an easement granted by Oakbrook Land Holdings, LLC ("Oakbrook") to the Southeast Regional Land Conservancy ("SRLC") in December 2008 constitutes a "qualified conservation contribution" under section 170(h)(1), entitling Oakbrook to the charitable contribution deduction claimed for that year. Applying the text of the statute to the terms of the easement before us leads me to conclude that the easement is not a "qualified conservation contribution" because it fails to grant to the charity all of the rights inherent in the interest in real property contemplated by the statute.  Thus, in my view, the Commissioner was right to disallow Oakbrook's charitable contribution deduction, and the deficiency that the Commissioner determined must be upheld.  See infra Part I.  Because the opinion of the Court announces the same disposition, I concur in that result.

Since applying the text of the statute to the terms of the easement before us suffices to resolve the dispute before the Court, there is no need to address the much more difficult question of the validity of section 1.170A-14(g)(6), Income Tax Regs.  Accord Stromme v. Commissioner, 138 T.C. 213, 218 n.8 (2012) ("For now, the better course is 'to observe the wise limitations on our function and to confine ourselves to deciding only what is necessary to the disposition of the immediate case.'" (quoting Whitehouse v. Ill. Cent. R.R., 349 U.S. 366, 372-373

(1955))); see McLaine v. Commissioner, 138 T.C. 228, 242 (2012) (expressing the same view); see also, e.g., PDK Labs. Inc. v. DEA, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment) (explaining that where "a sufficient ground [exists] for deciding * * * [a] case, * * * the cardinal principle of judicial restraint--if it is not necessary to decide more, it is necessary not to decide more--counsels us to go no further"). Unlike the opinion of the Court, I would leave that question for another day when its answer would make a difference to the resolution of a case before us.

Because the opinion of the Court decides to do otherwise, however, I explain below why a portion of the regulation upheld by the opinion of the Court, if interpreted as the Commissioner urges, reflects an unreasonable interpretation of the statute under step two of the framework established by Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984), see infra Part II, and also fails to meet the procedural requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. sec. 553 (2018), see infra Part III.

I.     The Easement Fails To Meet the Statutory Requirements.

I begin by considering first things first: whether the Conservation Easement and Declaration of Restrictions and Covenants (the "Deed") through which Oakbrook granted an easement covering about three-quarters of its tract to SRLC

passes muster under section 170(h). As the opinion of the Court observes, the parties understood that changes in circumstances might make it impossible to continue protecting the conservation area in the future. See op. Ct. p. 4.

The dispute before us focuses on the provisions of the Deed addressing the possibility of unanticipated changes in circumstances. If that possibility were to materialize, the Deed provides that the donee will be entitled to an amount

> equal to the difference between (a) the fair market value of the Conservation Area as if not burdened by this Conservation Easement and (b) the fair market value of the Conservation Area burdened by this Conservation Easement, as such values are determined as of the date of this Conservation Easement, (c) less amounts for improvements made by [Oakbrook] in the Conservation Area subsequent to the date of this Conservation Easement * * *

Deed art. VI, sec. B(2). As explained further below, this provision fails to convey to the donee the requisite rights under section 170(h)(2)(C) and (5)(A).

A.      Statutory Framework

Section 170 generally allows a deduction for contributions to certain charitable organizations. See sec. 170(a), (c). See generally Glass v. Commissioner, 471 F.3d 698, 706-708 (6th Cir. 2006) (providing a summary of the rules governing deductions for qualified conservation easements), aff'g 124 T.C. 258 (2005). But section 170 also imposes restrictions on the types of contributions for which a deduction is allowed. As relevant here, subparagraph A

of section 170(f)(3) generally disallows a deduction for contributions of partial interests in property. Yet what subparagraph A takes away, subparagraph B gives back in certain circumstances. In the words of that provision, "[s]ubparagraph (A) shall not apply to * * * [among others] a qualified conservation contribution." Sec. 170(f)(3)(B)(iii).

Section 170(h)(1) tells us what a "qualified conservation contribution" is:

For purposes of subsection (f)(3)(B)(iii), the term "qualified conservation contribution" means a contribution--

(A) of a qualified real property interest,

(B) to a qualified organization,

(C) exclusively for conservation purposes.

That definition includes its own defined terms. Thus, section 170(h)(2) explains:

For purposes of * * * [section 170(h)], the term "qualified real property interest" means any of the following <u>interests in real property</u>:

(A) the entire interest of the donor other than a qualified mineral interest,

(B) a remainder interest, and

(C) a restriction (granted in perpetuity) on the use which may be made of the real property. [Emphasis added.]

Section 170(h)(3) goes on to explain what a "qualified organization" is for these purposes,[1] and section 170(h)(4) defines what constitutes a "conservation purpose." The statute also provides that "[a] contribution shall not be treated as exclusively for conservation purposes <u>unless the conservation purpose is protected in perpetuity</u>." Sec. 170(h)(5)(A) (emphasis added).[2]

The upshot of these provisions is that a donor who contributes to an appropriate organization a partial "interest[] in real property" may be entitled to a charitable contribution deduction if (1) that interest is a restriction on how the real property may be used, (2) the restriction is granted in perpetuity, (3) the restriction advances (that is, is "for") a conservation purpose, and (4) the conservation purpose is protected in perpetuity.

B.     <u>Application of Statutory Framework to the Easement</u>

Oakbrook cannot prevail because the easement at issue here fails to meet the requirements of the statute. Specifically, Deed article VI, section B(2), which sets forth the formula to determine the amount to which SRLC would be entitled where

---

[1]The parties agree that the easement at issue was granted to a "qualified organization," making it unnecessary to linger over this requirement.

[2]The parties also agree that the easement was for a "conservation purpose." As explained in more detail below, the dispute is whether it was "exclusively" so.

an unexpected change in conditions makes impossible or impractical the continued use of the easement for conservation purposes, runs counter to the Code.

The Code does not address explicitly what should happen if unexpected changes that occur after the granting of the easement make it impossible or impractical to continue using the property for the conservation purposes set out in the Deed. But that does not mean that it is silent on this score, and the parties appear to agree that, if the donor and the donee's real property interests are converted into money as a result of such unexpected changes, the statutory requirement of section 170(h)(5)(A) can be satisfied so long as the donee receives an appropriate amount of money and uses that money in a manner consistent with the purposes of the original contribution. The only question is what the appropriate amount of money should be.

Oakbrook maintains that the requirement of section 170(h)(5)(A) is met so long as the donee, upon a sale or other disposition after extinguishment by judicial proceeding, would obtain an amount equal to the fair market value of the easement at the time the easement was established, subject to reduction for subsequent improvements funded exclusively by the donor.[3] But Oakbrook's position ignores

[3]By contrast, the Commissioner maintains that, under the terms of the easement, the donee must both get the benefit of any appreciation in the value of

(continued...)

the fact that, to be eligible for a deduction under section 170(h) in the first place, a donor must grant to a donee an "interest[] in real property." Sec. 170(h)(2). One of the rights inherent in a real property interest (and presumably required to be transferred to the donee in order to satisfy section 170(h)(2)(C)) is the property holder's right to be compensated at fair market value upon a subsequent transfer or taking. See Tenn. Code Ann. sec. 29-17-910 (2020) ("In all instances the amount to which an owner is entitled shall be determined by ascertaining the fair cash market value of the property or property rights taken[.]"); McKinney v. Smith Cty., No. M1998-00074-COAR3CV, 1999 WL 1000887, at *6-*7 (Tenn. Ct. App. Nov. 5, 1999) (addressing the compensation due to the owner of an "easement of access [that] has been taken or impaired by the State" and collecting authorities).[4]

_____

[3](...continued)
the easement from the time the easement was granted up to the time it is converted into money and share in any appreciation attributable to improvements to the property funded exclusively by the donor.

[4]For additional analysis on this point, consider also Olson v. United States, 292 U.S. 246, 254-255 (1934) (noting, in a case involving an easement permitting private land to be flooded from time to time, that "'no private property shall be appropriated to public uses unless a full and exact equivalent for it be returned to the owner'" and observing that "[t]hat equivalent is the market value of the property at the time of the taking contemporaneously paid in money" (quoting Monongahela Navigation Co. v. United States, 148 U.S. 312, 326 (1893))), and United States v. Miller, 317 U.S. 369, 373-374 (1943) (observing that "the courts early adopted, and have retained, the concept of market value" for determining the

(continued...)

The fair market value of a real property interest would be expected to change--i.e.,

increase or decrease--based on changes in circumstances.[5]  But, under the

_____

[4](...continued)
value of property taken by Government action).  See also United States ex rel.
Tenn. Valley Auth. v. Easement and Right of Way Over a Tract of Land in
Madison Cty., 405 F.2d 305, 307 (6th Cir. 1968) (calculating "just compensation"
after State condemnation of easement); Turner v. United States, 23 Cl. Ct. 447
(1991) (applying Miller in awarding damages with respect to a flooding
easement); United States v. An Easement and Right-of-Way Over 3.74 Acres of
Land, More or Less, in Montgomery Cty., 415 F. Supp. 3d 812, 818-819 (M.D.
Tenn. 2019) (calculating "just compensation" after State condemnation of
easement); 2 Thompson on Real Property, Thomas Editions, sec. 14.04(c)(1)
(2019) ("Ownership has been likened to a bundle of sticks.  Each stick represents
one of the total number of possible interests in sum of rights, powers, privileges,
immunities and liabilities.  * * * If one conceives of property as likened thus to a
bundle of rights, privileges, immunities and liabilities adaptable to any physical
thing, the fee simple absolute is the largest segment thereof that the political
philosophy of the time and place permits any private individual to obtain."); 9
Thompson on Real Property, supra, sec. 80.08(b)(2)(ii) ("Where the taking is not
total, the 'before and after' rule is commonly used.  Just compensation for a partial
taking is calculated either at (a) the value of the remainder before taking minus the
value of the remainder after taking, or (b) the value of the entire tract before the
taking minus the value of the remainder after the taking."  (Fn. ref. omitted.)).

[5]"For those who consider legislative history relevant," Warger v. Shauers,
574 U.S. 40, 48 (2014), I note for context that, in their reports on the bills
proposing what became section 170(h), both the House Ways and Means
Committee and the Senate Finance Committee took as a given the right of an
easement holder to be compensated at fair market value for transferring that right,
see H.R. Rept. No. 96-1278, at 19 (1980); S. Rept. No. 96-1007, at 14 (1980),
1980-2 C.B. 599, 606.  As the House committee report observed:

In general, a deduction is allowed for a charitable contribution in the
amount of the fair market value of the contributed property, defined

(continued...)

approach Oakbrook proposes (and the Deed reflects), the only amount guaranteed

to the owner of the easement (i.e., the donee) in the event the real property rights

are converted into cash is a fixed dollar amount equal to the fair market value of

the easement as of the grant date. That fixed dollar amount fails to account for any

market-based appreciation that may have occurred after the grant of the easement.

The formula set out in the Deed exposes the fundamental problem for Oakbrook--

under the terms of the Deed, the donee never received the type of "interest[] in real

property" contemplated by section 170(h)(2)(C) and further protected by section

170(h)(5)(A). Put another way, by failing to convey to the donee the unrestricted

right to be compensated at fair market value upon a future transfer or taking, the

---

[5](...continued)
as the price at which the property would change hands between a willing buyer and a willing seller. Thus, the amount of the deduction for the contribution of a conservation easement or other restriction is the fair market value of the interest conveyed to the recipient. However, because markets generally are not well established for easements or similar restrictions, the willing buyer/willing seller test may be difficult to apply (although it may become increasingly possible to determine the value of conservation easements by reference to amounts paid for such interests in easement acquisition programs as such programs increase). * * *

H.R. Rept. No. 96-1278, at 19 (emphasis added); S. Rept. No. 96-1007, at 14, 1980-2 C.B. at 606.

Deed so restricted the donee's interest as to cause it to fall outside the purview of section 170(h)(2)(C).

The shortcoming inherent in the Deed also affects Oakbrook's compliance with section 170(h)(5)(A). The payment of a predetermined fixed amount would be insufficient as compensation for a right "protected in perpetuity" if the fair market value of the property had appreciated since the date the easement was granted. When a transfer of money to the donee is intended to satisfy the "perpetuity of purpose" requirement of section 170(h)(5)(A), no reasonable reading of the statute would bless the donee receiving an amount that is less than the fair market value of its "interest[] in real property" as of the time of the conversion of its interest into cash.[6]

---

[6]As the Supreme Court has observed, "[b]ecause the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" Phillips v. Wash. Legal Found., 524 U.S. 156, 164 (1998) (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972)). Tennessee accordingly could mandate that the donor receive all amounts from any judicial extinguishment. As Oakbrook has not made that point (which would clinch the case on its behalf), I assume that, under Tennessee law, Oakbrook is not entitled to such proceeds and that such proceeds would be allocated to the donor and the donee on the basis of the relevant values of the real property interests at issue at the time of extinguishment. Cf. Tenn. Code Ann. sec. 29-16-203(c)(1) (2020) (providing rules for the allocation of proceeds between a landlord and a tenant in an eminent domain proceeding).

In short, because the Deed fails to satisfy the provisions of the statute, Oakbrook would not be entitled to a charitable contribution deduction. The Commissioner's disallowance of that deduction must therefore be sustained.

II.     The Commissioner's Reading of the Donor Improvements Portion of the Regulation Does Not Survive Substantive Review Under Step Two of Chevron.

As explained above, the statute provides a sufficient basis for denying the deduction at issue here. In light of that conclusion, I need not address the validity of the regulation. Indeed, we should not. As Justice Frankfurter once cautioned, when faced with "perplexing questions," "[t]heir difficulty admonishes us to observe the wise limitations on our function and to confine ourselves to deciding only what is necessary to the disposition of the immediate case." Whitehouse, 349 U.S. at 372-373. This Court has heeded that admonition in the past. Stromme v. Commissioner, 138 T.C. at 218 n.8 (citing Whitehouse, 349 U.S. at 372-373, Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 345-346 (1936) (Brandeis, J., concurring), and Liverpool, N.Y. & Phila. S.S. Co. v. Comm'rs of Emigration, 113 U.S. 33, 39 (1885)); accord McLaine v. Commissioner, 138 T.C. at 242. It should do so here as well.

The opinion of the Court nonetheless has chosen to consider and uphold the validity of the regulation. In so doing, it endorses the gloss that the Commissioner

has applied to the regulation with respect to donor improvements--a topic wholly absent from the text of the regulation. Because the opinion of the Court upholds the regulation in its entirety, it becomes necessary to set out my reasons for disagreeing with the Court's conclusion on this score. As explained in further detail below, I believe that, if interpreted as the Commissioner requests, the portion of the regulation addressing donor improvements does not survive substantive review under step two of the Chevron framework.

Before turning to this point, however, I consider first whether the regulation at issue needs to be interpreted as the Commissioner urges.

A. Section 1.170A-14(g)(6) Is Susceptible to Two Potential Readings.

As discussed above section 170(h)(1)(C) allows a deduction only when the contribution of a qualified real property interest is "exclusively for conservation purposes," and section 170(h)(5)(A) provides that "[a] contribution shall not be treated as exclusively for conservation purposes unless the conservation purpose is protected in perpetuity." (Emphasis added.) Moreover, when it comes to easements, the grant must be "in perpetuity." Sec. 170(h)(2)(C). Implementing these provisions, section 1.170A-14(g)(6)(ii), Income Tax Regs., provides that

> for a deduction to be allowed under this section, at the time of the gift the donor must agree that the donation of the perpetual conservation restriction gives rise to a property right, immediately vested in the

donee organization, with a fair market value that is at least equal to the proportionate value that the perpetual conservation restriction at the time of the gift, bears to the value of the property as a whole at that time. * * *

The regulation provides, in my view, a fuller description of what the statute requires--that is, the conveyance of an "interest[] in real property" "granted in perpetuity" that does not limit in any way the charity's inherent right to monetize the fair market value of the conveyed interest at some point in the future. See supra Part I.A. and B. So far, the regulation is consistent with the statute and is unobjectionable.

The regulation goes on to explain that "[f]or purposes of this paragraph (g)(6)(ii), that proportionate value of the donee's property rights shall remain constant." Sec. 1.170A-14(g)(6)(ii), Income Tax Regs. This sentence is susceptible to two different readings.

1. Alternative 1

On the one hand, the sentence could be read to provide that, all else being equal, the proportionate values of the partial interests owned by the donor and the donee, respectively, do not change even as the fair market value of the property as a whole may vary with market conditions. To illustrate, if the value of the easement at the time the gift is made is $500,000, and the value of the property as

a whole at the same time is $1,000,000, the proportionate value of the donee's

property right would be 50% and the proportionate value of the donor's property

right would also be 50%. Thus, if the property remains unchanged by the donor

and is sold after a judicial extinguishment proceeding, as provided in

section 1.170A-14(g)(6)(i), Income Tax Regs., the donee and the donor would

each be entitled to 50% of the proceeds. This would be true whether the property

as a whole had increased in value to, say, $1,500,000 or had decreased in value to,

say, $500,000. In the first instance, the donee would be entitled to $750,000 of the

proceeds (i.e., 50% of $1,500,000), and, in the second, the donee would be entitled

to $250,000 (i.e., 50% of $500,000). In either situation, the donee would receive a

portion of the proceeds attributable to its own interest, taking into account market

developments. Consistent with this reading, the last sentence of section

1.170A-14(g)(6)(ii), Income Tax Regs., provides:

> Accordingly, when a change in conditions give rise to the
> extinguishment of a perpetual conservation restriction under
> paragraph (g)(6)(I) of this section, the donee organization, on a
> subsequent sale, exchange, or involuntary conversion of the subject
> property, must be entitled to a portion of the proceeds at least equal to
> that proportionate value of the <u>perpetual conservation restriction</u> * * *
> [Emphasis added.]

This reading of the regulation leaves open the possibility that improvements

by the donor to its own partial real property interest may need to be taken into

account if they occur. When such improvements are made, the parties would be expected to determine the fair market value of their respective interests as of the time of the improvements and provide for future allocations of proceeds in light of the improvements. Continuing with the example set out above, assume that three years after the easement is granted, when the value of the property as a whole has increased to $2,000,000, the donor decides to build a house worth $2,000,000 on the property as permitted by the express terms of the easement. Cf. sec. 1.170A-14(f), Examples (3) and (4), Income Tax Regs.; Letter from Michael S. Gruen, Easements Comm. Chairman, New York Landmarks Conservancy, to Commissioner of Internal Revenue (Aug. 31, 1983), Respondent's Response to Order Dated 02/27/2019, at 372 (filed Mar. 27, 2019) (the "NYLC Comment Letter") (setting out a similar example in comments provided to Treasury in response to the proposed regulations on conservation easements). Before the house is built, the value of the easement would be $1,000,000 ($2,000,000 times the preimprovement share of 50%). After the house is built, one would expect the value of the easement not to have changed, since the house improved the donor's retained real property interest. With respect to the donor, the interest in the unimproved land would be expected to be worth $1,000,000 ($2,000,000 times the preimprovement share of 50%), and the interest in the improvements would be

expected to be worth $2,000,000. If, shortly after completion of the house, the property were required to be sold to a governmental entity for $4,000,000 to permit the construction of a highway, the proceeds could be allocated as follows:

| Recipient and interest | Amount | Share of total proceeds |
| --- | --- | --- |
| Proceeds attributable to donee's interest | $1,000,000 | 25% |
| Proceeds attributable to donor's interest in unimproved land | 1,000,000 | 25% |
| Proceeds attributable to donor's improvements | 2,000,000 | 50% |
| Total | 4,000,000 | 100% |

As the example illustrates, the "proportionate value of the donee's property rights" remains constant when compared to the donor's property rights as they existed at the time of the grant. Although each of those rights is now worth only 25% of the total value of the property as a whole (and they were worth 50% of the total value of the property as a whole before the house was constructed), they still have a one-to-one relationship to each other.[7] Thus, under this reading of the

---

[7]The analysis set out in this Part II.A.1. is consistent with the analysis of the U.S. Court of Appeals for the Fifth Circuit in PBBM-Rose Hill, Ltd. v. Commissioner, 900 F.3d 193, 207-208 (5th Cir. 2018). There the Fifth Circuit made clear that all of the proceeds from a future sale must be taken into account before the ratio is applied and that those proceeds may not be reduced first to

(continued...)

regulation, permitting the donor to be compensated with respect to future

expenditures incurred in improving the donor's own property interest would not be

inconsistent with the text of the regulation.[8]

---

[7](...continued)
account for donor improvements. Id. at 208 (explaining that, because the deed at issue "permits the deduction of the value of improvements from the proceeds, prior to the donee taking its share, the provision fails to meet the requirement set forth in § 1.170A-14(g)(6)(ii)"); see also Carroll v. Commissioner, 146 T.C. 196, 203 (2016) (addressing a deed that had a similar provision). The Fifth Circuit did not consider the central analytical issue in this case--how to determine the proper ratio between the interests of donee and donor when the donor has made subsequent improvements to its retained interest, thereby increasing the fair market value of the property as a whole. The analysis set out in the text starts at the same point as the Fifth Circuit did--"the total amount brought in from the sale," PBBM-Rose Hill, Ltd. v. Commissioner, 900 F.3d at 208--and then focuses on how the donee's and donor's shares are computed before those shares are applied to the undiminished proceeds from the sale, see also infra note 8.

[8]Note that, under this reading of the regulation, donor improvements would not receive priority of compensation as compared to the donee's interest. For example, if, after the house was built, real property values in the area declined significantly and the overall fair market value of the property was reduced to $1,000,000, proceeds from a sale at that time would be distributed as follows:

(continued...)

2.      Alternative 2

The Commissioner maintains that the regulation does considerably more work than suggested by the reading under Alternative 1. In his view, the Deed must provide that the proportionate value of the donee's property rights will remain constant no matter what the donor does with respect to its own partial real property interest after the easement is granted. Under this categorical reading, if the donor makes significant improvements to its own partial interest, the donor

---

[8](...continued)

| Recipient and interest | Amount | Share of total proceeds |
|---|---|---|
| Proceeds attributable to donee's interest | $250,000 | 25% |
| Proceeds attributable to donor's interest in unimproved land | 250,000 | 25% |
| Proceeds attributable to donor's improvements | 500,000 | 50% |
| Total | 1,000,000 | 100% |

As before, the "proportionate value of the donee's property rights" remains constant when compared to the donor's property rights as they existed at the time of the grant. They still have a one-to-one relationship to each other. And, although the donee would receive only $250,000 of the overall proceeds, the reduction from the initial value of $500,000 is attributable to market forces. As the initial example in the text shows, see supra pp. 47-48, the donee would have received a similar (reduced) compensation if no improvements had been made and the overall value of the property at some point had declined to $500,000 from the initial overall value of $1,000,000.

may not be entitled to be compensated for the value of those improvements if the value of the property is converted into cash in the future.

To illustrate using the example from above, if, shortly after the house is completed, the property were required to be sold to a governmental entity for $4,000,000 to permit the construction of a highway, according to the Commissioner, the proceeds should be allocated as follows:

| Recipient and interest | Amount | Share of total proceeds |
|---|---|---|
| Proceeds allocated to donee | $2,000,000 | 50% |
| Proceeds allocated to donor (for unimproved land and the house) | 2,000,000 | 50% |
| Total | 4,000,000 | 100% |

It is not clear to me how a rule that is focused on the "proportionate value of the perpetual conservation restriction," sec. 1.170A-14(g)(6)(ii), Income Tax Regs. (emphasis added), may be read to force the donor to promise in the deed that the donor will turn over to the donee proceeds properly attributable to the donor's own retained real property interest. But that is how the Commissioner reads the

regulation and what the opinion of the Court accepts today. To my eye, however, that reading cannot survive step two of the <u>Chevron</u> analysis.[9]

    B.    <u>The Commissioner's Reading of the Donor Improvements Portion of the Regulation Does Not Survive Substantive Review Under Step Two of Chevron</u>.

Two preliminary comments before getting to the substantive issue. First, although in reviewing the validity of a regulation a court generally begins by considering whether the regulation complies with the APA's procedural requirements, in this case, it is useful to turn first to the substantive validity of the regulation, as an understanding of the substantive merits of the issue also sheds light on the validity of the procedures employed by Treasury in promulgating the regulation.

Second, for purposes of this analysis, I assume without deciding that the statute is ambiguous regarding the allocation of proceeds in the event of a judicial extinguishment of an easement. <u>See</u> <u>Good Fortune Shipping SA v. Commissioner</u>, 897 F.3d 256, 261 (D.C. Cir. 2018) ("[W]e may * * * assume arguendo that the

---

[9]<u>Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.</u>, 467 U.S. 837 (1984), provides the framework for analysis here unless and until that case is overruled. <u>See</u> <u>Baldwin v. United States</u>, 589 U.S. ___, 140 S. Ct. 690 (2020) (Thomas, J., dissenting from denial of certiorari).

statute is ambiguous and proceed to <u>Chevron</u>'s second step."), <u>rev'g</u> 148 T.C. 262 (2017).

Now to the merits. The question under <u>Chevron</u> step two is whether the interpretation of the regulation offered by the Commissioner reflects a permissible reading of the statute. As the Supreme Court has said:

> <u>Chevron</u> directs courts to accept an agency's reasonable resolution of an ambiguity in a statute that the agency administers. * * * [<u>Chevron</u>], at 842-843. Even under this deferential standard, however, "agencies must operate within the bounds of reasonable interpretation." <u>Utility Air Regulatory Group v. EPA</u>, 573 U.S. ___, ___ (2014) (slip op., at 16) (internal quotation marks omitted). * * *

<u>Michigan v. EPA</u>, 576 U.S. ___, ___, 135 S. Ct. 2699, 2707 (2015); <u>see also</u> <u>Tenn. Hosp. Assoc. v. Azar</u>, 908 F.3d 1029, 1037-1038 (6th Cir. 2018) (summarizing standard of review); <u>Atrium Med. Ctr. v. U.S. Dep't of Health & Human Servs.</u>, 766 F.3d 560, 566-568 (6th Cir. 2014) (same). Here, the Commissioner "strayed far beyond those bounds" when he read section 170(h)(5)(A) to require a donor to turn over to the donee a portion of the proceeds attributable to its own permissible retained real property interest. <u>Michigan</u>, 576 U.S. at ___, 135 S. Ct. at 2707.

It is well settled that

> [w]hether an agency's construction is reasonable depends, in part, "on the construction's 'fit' with the statutory language, as well as its conformity to statutory purposes." <u>Goldstein v. SEC</u>, 451 F.3d 873, 881 (D.C. Cir. 2006) (quoting <u>Abbott Labs. v. Young</u>, 920 F.2d

984, 988 (D.C. Cir. 1990)).  Indeed, "[t]he starting place for any Chevron Step Two inquiry is the text of the statute."  Van Hollen v. FEC, 811 F.3d 486, 492 (D.C. Cir. 2016).

Good Fortune Shipping SA v. Commissioner, 897 F.3d at 262.

I begin at the same starting place--the statutory text.  The statute provides a deduction for a contribution to a qualified organization of a "qualified real property interest" made "exclusively for conservation purposes."  Although the statute makes clear that there can be no deduction unless the conservation purposes are "protected in perpetuity," one cannot lose track of the fact that the deduction is predicated on a "qualified real property interest" being contributed to a qualified organization.  Thus, the most that a qualified organization can be entitled to receive if its "qualified real property interest" is extinguished in the future is the full value of that interest.  Whatever the purpose of a contribution, that purpose may not be invoked to require the donor to give the donee, as a precondition to receiving a deduction for his contribution, a right to receive compensation properly attributed to the real property interest that the Code permits the donor to retain.  A regulation interpreted to require otherwise cannot be a permissible interpretation of the statutory text before us.  Under that text, the interest the donee organization must obtain in connection with a contribution is the "qualified real property interest" transferred to it.  Requiring the donor to

promise to turn over to the donee proceeds in excess of the fair market value of that interest is inconsistent with the statutory framework, and nothing in the "statutory purposes" compels a different conclusion. Goldstein, 451 F.3d at 881 (quoting Abbott Labs., 920 F.2d at 988).

The opinion of the Court admits that "[i]t is conceivable that Treasury could have drafted a regulation that addressed the possibility of donor improvements, dealing with [the types of questions noted above] in some rational way." See op. Ct. p. 30. But the opinion of the Court overlooks the lack of a "rational" solution to those problems, by noting that "that was a policy decision for Treasury, not this Court, to make." See id. In the Court's view, "Treasury's overarching goal [in prescribing the regulation] was to guarantee that the donee, upon judicial extinguishment of the easement, would receive the full share of proceeds to which it was entitled. * * * Treasury exercised reasoned judgment by adhering to a simple rule that splits sale proceeds in a direct proportional manner." See id. p. 31.

I agree with the opinion of the Court that the donee should "receive the full share of proceeds to which it was entitled." See id. (emphasis added). But a rule interpreted to require the deed to allocate to the donee not only the proceeds attributable to its own real property interest but also a share of the proceeds

attributable to the interest the Code permits <u>the donor</u> to retain does not

"""fit"" with the statutory language" and is unreasonable. <u>Good Fortune Shipping</u>

<u>SA v. Commissioner</u>, 897 F.3d at 262 (quoting <u>Goldstein</u>, 451 F.3d at 881).

Calling it a "policy decision" does not change the fact that the rule, as interpreted

by the Commissioner, yields in certain circumstances a result that is entirely

unreasonable and without any basis in the statute. Under <u>Chevron</u>, Treasury is

entitled to draw lines on the page provided by Congress; <u>Chevron</u> does not give

Treasury legislative authority to substitute a different page for the one Congress

enacted into law. <u>See</u> <u>id.</u> (citing <u>Goldstein</u>, 451 F.3d at 881). In short, in my

judgment, if section 1.170A-14(g)(6)(ii), Income Tax Regs., is interpreted as the

Commissioner maintains with respect to all future donor improvements, it is an

unreasonable interpretation of the statute and therefore invalid.[10]

---

[10]I note that my conclusion here does not help Oakbrook. The Deed provides that proceeds from a future sale must first be paid to Oakbrook in respect of "improvements made by * * * [Oakbrook] in the Conservation Area subsequent to the date of this Conservation Easement." Deed art. VI, sec. B(2). As explained above, <u>see</u> <u>supra</u> notes 7 and 8, I do not think that an "improvements are compensated first" approach is consistent with the real property interests contemplated by the Code. Accordingly, this aspect of Oakbrook's Deed provides an additional, and independent, ground for denying the deduction at issue. This aspect of the Deed also provides one more reason to reserve for another day a decision on whether the regulation, as interpreted by the Commissioner, is valid insofar as it addresses improvements made by a donor after the granting of the easement.

III.    If Read as the Commissioner Proposes, the Donor Improvements Portion of the Regulation Does Not Comply With the Procedural Requirements of the APA.

Treasury might not have found itself in this predicament under Chevron if it had followed more carefully the APA's procedural requirements, which are designed to help agencies consider exactly this type of issue before a rule becomes final.  It is to those requirements that I now turn.

In evaluating whether the categorical reading of the donor improvements rule advanced by the Commissioner meets the procedural requirements of the APA, I consider first the framework that governs judicial review in this area.  I then apply that framework to Treasury's rulemaking process in the case before us.

A.    Applicable Framework for Judicial Review

The APA sets out procedural requirements for the promulgation of legislative rules.  As relevant here, an agency wishing to adopt such a rule must provide notice in the Federal Register.  5 U.S.C. sec. 553(b).  In addition,

> [a]fter notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation.  After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. * * *

5 U.S.C. sec. 553(c). Section 706 of the APA, which sets the boundaries for judicial review of agency actions, provides that a "reviewing court shall * * * hold unlawful and set aside agency action, findings, and conclusions found to be * * * arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. sec. 706(2)(A) (2018).

The framework for reviewing whether an agency has complied with the procedural requirements of the APA is well established. As the Supreme Court has explained with respect to legislative rules such as the ones before us:

> One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions. The agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co., 463 U.S. 29, 43 (1983) (internal quotation marks omitted). That requirement is satisfied when the agency's explanation is clear enough that its "path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 286 (1974). But where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law. See 5 U.S.C. § 706(2)(A); State Farm, supra, at 42-43.

Encino Motorcars, LLC v. Navarro, 579 U.S. ___, ___, 136 S. Ct. 2117, 2125 (2016).

When the record does not contain "that minimal level of analysis," "[i]t is not the role of the courts to speculate on reasons that might have supported an agency's decision. '[W]e may not supply a reasoned basis for the agency's action that the agency itself has not given.'" Id. at ___, ___, 136 S. Ct. at 2125, 2127 (quoting State Farm, 463 U.S. at 43); see also Atrium Med. Ctr., 766 F.3d at 568 ("[A]n agency cannot bolster its case with rationales offered post hoc." (citing Columbus & S. Ohio Elec. Co. v. Costle, 638 F.2d 910, 912 (6th Cir. 1980))).

As the Supreme Court further explained in Judulang v. Holder, 565 U.S. 42, 52-53 (2011),

> [t]he scope of * * * [judicial] review under * * * [section 706(2)(A) of the APA] is "narrow"; as we have often recognized, "a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co., 436 U.S. 29, 43 (1983); see Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). Agencies * * * have expertise and experience in administering their statutes that no court can properly ignore. But courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking. When reviewing an agency action, we must assess, among other matters, " 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " State Farm, 463 U.S. at 43 (quoting Bowman Transp. Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285). That task involves examining the reasons for agency decisions--or, as the case may be, the absence of such reasons. See FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009) (noting "the requirement that an agency provide reasoned explanation for its action").

Accord Atrium Med. Ctr., 766 F.3d at 567 ("At base, arbitrary and capricious review functions to 'ensur[e] that agencies have engaged in reasoned decisionmaking.'" (quoting Judulang, 565 U.S. at 53)).

A recent decision by the U.S. Court of Appeals for the District of Columbia Circuit aptly summarizes the APA's procedural requirements, particularly as they address the need for an agency to consider comments:

> "The APA's arbitrary-and-capricious standard requires that agency rules be reasonable and reasonably explained." Nat'l Tel. Coop. Ass'n v. FCC, 563 F.3d 536, 540 (D.C. Cir. 2009). An agency violates this standard if it "entirely fail[s] to consider an important aspect of the problem." State Farm, 463 U.S. at 43. An agency also violates this standard if it fails to respond to "significant points" and consider "all relevant factors" raised by the public comments. Home Box Office, Inc. v. FCC, 567 F.2d 9, 35-36 (D.C. Cir. 1977).
>
> Accordingly, an agency must respond to comments "that can be thought to challenge a fundamental premise" underlying the proposed agency decision. MCI WorldCom, Inc. v. FCC, 209 F.3d 760, 765 (D.C. Cir. 2000). An agency need not "discuss every item of fact or opinion included in the submissions made to it." Del. Dep't of Nat. Res. & Envtl. Control v. EPA, 785 F.3d 1, 17 (D.C. Cir. 2015) (citation omitted). An agency's response to public comments, however, must be sufficient to enable the courts "to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did." Id. (citation omitted). Even when an agency "has significant discretion in deciding how much weight to accord each statutory factor," that does not mean it is "free to ignore any individual factor entirely." Tex. Oil & Gas Ass'n v. EPA, 161 F.3d 923, 934 (5th Cir. 1998) (citing Weyerhaeuser Co. v. Costle, 590 F.2d 1011, 1045 (D.C. Cir. 1978)) (evaluating agency's consideration of statutory factors under arbitrary-and-capricious review).

Carlson v. Postal Regulatory Comm'n, 938 F.3d 337, 343-344 (D.C. Cir. 2019).

Put another way, "[a]n agency is required to provide a meaningful opportunity for comments, which means that the agency's mind must be open to considering them." Grand Canyon Air Tour Coal. v. FAA, 154 F.3d 455, 468 (D.C. Cir. 1998) (citing McLouth Steel Prods. Corp. v. Thomas, 838 F.2d 1317, 1323 (D.C. Cir. 1988)). "An agency must also demonstrate the rationality of its decision-making process by responding to those comments that are relevant and significant." Id. (citing Prof'l Pilots Fed'n v. FAA, 118 F.3d 758, 763 (D.C. Cir. 1997), and Home Box Office, 567 F.2d at 35);[11] see also PPG Indus., Inc. v. Costle, 630 F.2d 462, 466 (6th Cir. 1980) (explaining that the APA requires agencies "to give reasoned responses to all significant comments in a rulemaking proceeding").

The reasons for the procedural requirements of the APA are not difficult to understand.

---

[11]As the Court of Appeals in Home Box Office, Inc. v. FCC, 567 F.2d 9, 35 n.58 (D.C. Cir. 1977), noted:

> In determining what points are significant, the "arbitrary and capricious" standard of review must be kept in mind. Thus only comments which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule cast doubt on the reasonableness of a position taken by the agency. * * *

> [They] are intended to assist judicial review as well as to provide fair treatment for persons affected by a rule. To this end there must be an exchange of views, information, and criticism between interested persons and the agency. Consequently, the notice required by the APA, or information subsequently supplied to the public, must disclose in detail the thinking that has animated the form of a proposed rule and the data upon which that rule is based. Moreover, a dialogue is a two-way street: the opportunity to comment is meaningless unless the agency responds to significant points raised by the public. A response is also mandated by Overton Park, which requires a reviewing court to assure itself that all relevant factors have been considered by the agency.

Home Box Office, 567 F.2d at 35-36 (fn. ref. omitted) (citations omitted); see also

Dismas Charities, Inc. v. U.S. Dep't of Justice, 401 F.3d 666, 678 (6th Cir. 2005)

("[O]ne of the central purposes of the * * * [notice-and-comment requirement] is

to give those with interests affected by rules the chance to participate in the

promulgation of the rules * * * [and] ensure fair treatment for persons to be

affected by regulations.").

Notwithstanding the very good reasons for requiring an agency to respond

to comments,

> an agency's failure to address a particular comment or category of comments is not an APA violation per se. See, e.g., Thompson v. Clark, 741 F.2d 401, 408 (D.C. Cir. 1984) ("[APA § 553] has never been interpreted to require the agency to respond to every comment, or to analyze every issue or alternative raised by the comments, no matter how insubstantial."). We review an agency's response to comments under the same arbitrary-and-capricious standard to which we hold the rest of its actions. See Home Box Office, 567 F.2d at 35

n.58.  Put simply, "The failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors."  Covad Commc'ns v. FCC, 450 F.3d 528, 550 (D.C. Cir. 2006) (quoting Thompson, 741 F.2d at 409).

Sherley v. Sebelius, 689 F.3d 776, 784 (D.C. Cir. 2012); see also PPG Indus., 630 F.2d at 466.

B.     Application of Framework for Judicial Review

Having outlined above the framework that governs our review of the regulation at issue here, I turn next to applying that framework.

1.     Treasury's Rulemaking Process

I begin by summarizing what we know about Treasury's rulemaking process in this case.  On May 23, 1983, Treasury and the Internal Revenue Service (the "IRS")[12] issued a notice proposing "regulations relating to contributions of partial interests in property for conservation purposes."  48 Fed. Reg. 22940 (May 23, 1983).  The stated purpose of the notice was "to clearify [sic] the statutory rules in effect under * * * [the Tax Treatment Extension Act of 1980]."  Id.  The notice also observed that "[t]he regulations reflect the major policy decisions made by the Congress and expressed in * * * [the] committee reports" that accompanied the

---

[12]For simplicity, I refer to both Treasury and the IRS as "Treasury."

legislation.  Id.  The notice spanned roughly eight pages of the Federal Register, including a one-page preamble.  The notice also invited public comments and explained that "[a] public hearing * * * [would] be held upon written request to the Commissioner by any person who has submitted written comments."  Id. at 22941.  The initial deadline for submitting comments was July 22, 1983.  Id. at 22940.  That deadline was subsequently extended to September 1, 1983.  See 48 Fed. Reg. 33006 (July 20, 1983).

In response to the notice, Treasury received more than 700 pages of comments during the extended comment period[13] and at least another 130 pages after the comment period had closed.[14]  A hearing on the proposed regulation was requested and was held on September 15, 1983.  Thirty-seven members of the public were originally scheduled to speak at the hearing, and 30 actually spoke. The hearing lasted more than five hours, and the transcript exceeds 200 pages.

---

[13]Some public comments in the administrative record were transmitted after the close of the extended comment period on September 1, 1983, but before the public hearing took place on September 15, 1983.

[14]Although some comments cover overlapping issues, they do not appear to be mass generated by nonexistent commenters.  Cf. James V. Grimaldi, "U.S. News:  FCC Chief Proposes Revamp of Online Comments," Wall St. J., July 12, 2018, at A3; James V. Grimaldi and Paul Overberg, "Fiduciary Rule Draws A Lot of Fake Critics," Wall St. J., Dec. 28, 2017, at B1; James V. Grimaldi and Paul Overberg, "Fake Comments Hit Rule Making--Phony Submissions Target Net Neutrality," Wall St. J., Dec. 13, 2017, at A1.

A Treasury Decision adopting final regulations was published in the Federal Register on January 14, 1986. See T.D. 8069, 1986-1 C.B. 89, 51 Fed. Reg. 1496 (Jan. 14, 1986). The Treasury Decision spanned roughly 12 pages, of which approximately 10 contained the actual text of the regulations. That left just over two pages for Treasury's responses to comments and other administrative matters (for example, the Paperwork Reduction Act notice and drafting information). Put another way, Treasury used six columns of the Federal Register to address more than 700 pages of timely comments and more than 200 pages of public testimony. Those six columns were intended to cover comments on a "regulation project consisting of 10 paragraphs, 23 subparagraphs, 30 subdivisions, and 21 examples." See op. Ct. p. 24.

One might wonder how an agency familiar with the D.C. Circuit's decision in Home Box Office, which by 1986 had been on the books for more than eight years, could have thought that six columns in the Federal Register sufficed to "respond[] to significant points raised by the public" in more than 700 pages, or how that response constituted a "dialogue" between the agency and the public contemplated by the APA as interpreted by Home Box Office and the authorities on which it relied. Home Box Office, 567 F.2d at 35-36 (fn. ref. omitted); see also PPG Indus., 630 F.2d at 466 (reiterating that the APA requires agencies "to give

reasoned responses to all significant comments in a rulemaking proceeding").

Even for an agency determined to be exceedingly "concise," six columns in the

Federal Register would be a tight amount of space to show "what major issues of

policy were ventilated . . . and why the agency reacted to them as it did." Carlson,

938 F.3d at 344 (alteration in original) (quoting Del. Dep't of Nat. Res. & Envtl.

Control v. EPA, 785 F.3d 1, 17 (D.C. Cir. 2015)).

But, in my view, Treasury did not think it confronted such a Herculean task.

It is more likely that Treasury was simply following its historical position that the

APA's procedural requirements did not apply to these types of regulations.[15]  As

the Treasury Decision explains, Treasury took the view that "[a]lthough a notice of

proposed rulemaking which solicited public comments was issued, the * * * [IRS]

concluded when the notice was issued that the regulations are interpretative and

that the notice and public comment procedure requirement of 5 U.S.C. 553 did not

---

[15]See Kristin E. Hickman, "Coloring Outside the Lines:  Examining Treasury's (Lack of) Compliance with Administrative Procedure Act Rulemaking Requirements," 82 Notre Dame L. Rev. 1727, 1729 (2007) ("Treasury acknowledges that APA section 553 governs its various regulatory efforts. Treasury also contends, however, that most Treasury regulations are interpretive in character and thus exempt from the public notice and comment requirements by the APA's own terms."  (Fn. ref. omitted.)).

apply."[16]  T.D. 8069, 1986-1 C.B. at 92.  When an agency engaged in a particular rulemaking exercise believes the APA does not require it to provide notice and receive comments at all, it is not difficult to see why that agency might think that a rather brief explanation, offered as it were out of its own generosity, should be good enough.[17]

The problem with this position, however, is that Treasury's conclusion that the regulation at issue here did not require notice and comment was mistaken, as the opinion of the Court correctly makes clear.  See op. Ct. pp. 17-18.  In light of that conclusion, at least with respect to the donor improvements interpretation that the Commissioner advances before us, the six Federal Register columns that

---

[16]On this basis, the Treasury Decision concluded that "the final regulations do not constitute regulations subject to the Regulatory Flexibility Act (5 U.S.C. chapter 6)."  T.D. 8069, 1986-1 C.B. 89, 92, 51 Fed. Reg. 1498.

[17]There is no doubt that Treasury knows how to provide meaningful responses to comments when it considers itself bound by the notice and comment requirements of the APA.  See, e.g., T.D. 9846, 2019-9 I.R.B. 583, 84 Fed. Reg. 1838 (Feb. 5, 2019) (Treasury Decision concerning regulations under section 965 spanned 78 pages of the Federal Register, including a preamble of more than 36 pages, of which more than 30 pages responded to comments); T.D. 9790, 2016-45 I.R.B. 540, 81 Fed. Reg. 72858 (Oct. 21, 2016) (Treasury Decision concerning regulations under section 385 spanned 127 pages of the Federal Register, including a preamble of more than 90 pages, of which more than 80 pages responded to comments).

Treasury offered fail to provide "that minimal level of analysis" required by the APA.  Encino Motorcars, 579 U.S. at ___, 136 S. Ct. at 2125.

As explained further below, Treasury failed to "respond to 'significant points' and consider 'all relevant factors' raised by the public comments."  See Carlson, 938 F.3d at 344 (quoting Home Box Office, 567 F.2d at 35-36); PPG Indus., 630 F.2d at 466.

>      2.      Application of Framework to Treasury's Rulemaking Process

The question of how to treat donor improvements undertaken after the grant of the easement in the event the property was subsequently sold was put squarely before Treasury during the comment period.  On August 31, 1983, the New York Landmarks Conservancy ("NYLC") submitted a comment letter of just over four pages.  See NYLC Comment Letter, supra.  Two of those pages were dedicated to the extinguishment provisions at issue here, and nearly half of that discussion focused on the treatment of future improvements made by the donor.  On future improvements, the NYLC Comment Letter explained as follows:

> The structure of § 1.170A-13(g)(5)(ii) [the proposed rule for what is now section 1.170A-14(g)(6)(ii), Income Tax Regs.,] contemplates that a ratio of value of the conservation restriction to value of the fee will be fixed at the time of the donation and will remain in effect forever thereafter.  This formula fails to take into account that improvements may be made thereafter by the owner which should properly alter the ratio.  For example, (using the facts of example 4 in

§ 1.170A-13(f) [the proposed rule for what is now section 1.170A-14(f), Income Tax Regs.,] at page 22945), suppose the donation of a scenic easement upon Greenacre providing limited cluster development in areas generally not visible from a nearby national park. At the time of the donation, Greenacre was worth $100,000 and the easement accounts for 10% of the value. Thereafter, the owner spends $2 million on the construction of housing units to be rented. If the easement were subsequently extinguished, the donee organization would be entitled under § 1.170A-13(g)(5)(ii) to 10% of the sale price of the entire parcel including the improvements. <u>This would obviously be undesirable to the prospective donor and would constitute a windfall to the donee organization.</u>

\* \* \* \* \* \* \*

In light of the potential inequities described above, the \* \* \* [NYLC] recommends that the proposed proceeds formula be revised to prevent such inequities should the Department of the Treasury decide to retain the provision. However, the \* \* \* [NYLC] strongly recommends deletion of the entire extinguishment provision.

Respondent's Response to Order Dated 02/27/2019, at 374-375 (emphasis added).

The NYLC Comment Letter supported its recommendation as follows:

The provisions for apportionment of proceeds in the case of extinguishment of a conservation restriction \* \* \* contain problems of policy and practical application so pervasive as to cause us to recommend strongly the deletion of these provisions. The statute was enacted by Congress to encourage the protection of our significant natural and built environment through the donation of conservation restrictions and yet, the proposed provisions would thwart the purpose of the statute by deterring prospective donors.

<u>Id.</u> at 373.

As shown above, the NYLC Comment Letter made clear that, in its view, it would be inappropriate to condition the availability of the deduction for a conservation easement on the donor's agreement to turn over to the donee proceeds attributable to improvements on the real property interest that the Code permitted the donor to retain. The NYLC Comment Letter expressly tied its comments both to a specific rule included in the proposed regulations--proposed section 1.170A-13(g)(5)(ii) (which ultimately became current section 1.170A-14(g)(6)(ii), Income Tax Regs.)--and to a specific fact pattern contemplated by the proposed regulations--Example (4) in proposed section 1.170A-13(f) (which ultimately became Example (4) in section 1.170A-14(f), Income Tax Regs.). The NYLC Comment Letter also explained that the proposed rule would "thwart the purpose of the statute," which, according to NYLC, was to "encourage the protection of our significant natural and built environment through the donation of conservation restrictions." Id. at 373. A proposed rule that required a donor to turn over to the donee proceeds that were properly attributable to the retained interest of the donor "would obviously be undesirable to the prospective donor and would constitute a windfall to the donee organization." Id. at 374. In light of these concerns, NYLC recommended that this provision be deleted or, at the very least, "be revised to prevent * * * [the] inequities" it had identified. Id.

The record leaves no doubt that NYLC made comments "'that can be thought to challenge a fundamental premise' underlying the proposed agency decision." Carlson, 938 F.3d at 344 (quoting MCI WorldCom, Inc., 209 F.3d at 765). The preamble to the proposed regulations had explained that the proposed rules "reflect the major policy decisions made by the Congress." 48 Fed. Reg. 22940. The NYLC Comment Letter in effect countered that the proposed rule on future donor improvements was contrary to those policy decisions, would lead to inequitable results that were inconsistent with the statute, and would deter future contributions. In short, the NYLC Comment Letter offered comments that, "if adopted, would require a change in an agency's proposed rule." Home Box Office, 567 F.2d at 35 n.58. Those comments were both "relevant and significant," requiring a response. Grand Canyon, 154 F.3d at 468; accord Carlson, 938 F.3d at 343-344.

Unfortunately, however, the Treasury Decision finalizing the regulations contains no such response. The Treasury Decision changed the sentence on which the Commissioner relies with respect to donor improvements as follows (with the relevant change underscored):

> (1)    Proposed Regulation:  "For purposes of this paragraph (g)(5)(ii), that original minimum proportionate value of the donee's property rights shall remain constant."  48 Fed. Reg. 22946.

(2)    Final Regulation:  "For purposes of this paragraph (g)(6)(ii), <u>that proportionate value</u> of the donee's property rights shall remain constant."  T.D. 8069, 1986-1 C.B. at 99.

But Treasury gave no explanation as to how the change addressed the concerns expressed in the NYLC Comment Letter.  In short, Treasury's actions did not provide "an explanation [that] is clear enough that its 'path may reasonably be discerned.'"  <u>Encino Motorcars</u>, 579 U.S. at ___, 136 S. Ct. at 2125 (quoting <u>Bowman Transp.</u>, 419 U.S. at 286).[18]  Nor does Treasury's action provide any insight on "what major issues of policy were ventilated . . . and why the agency reacted to them as it did" on this point.  <u>Carlson</u>, 938 F.3d at 344 (quoting <u>Del. Dep't of Nat. Res. & Envtl. Control</u>, 785 F.3d at 17).  Absent any explanation from Treasury on why the considerations raised by NYLC should not have been heeded, "[i]t is not the role of the courts to speculate on reasons that might have

---

[18]In <u>Bowman Transportation</u>, the case that gave rise to the "path may reasonably be discerned" formulation, the Supreme Court observed that the Interstate Commerce Commission had in fact provided an explanation of how it had viewed the relevant evidence and proceeded to discuss that explanation. <u>Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.</u>, 419 U.S. 281, 290 (1974) ("The question before the Commission was whether service on the routes at issue would be enhanced by permitting new entry, and as to this the performance by prospective entrants on new routes was of limited relevance.  The Commission noted with respect to transit times that different highway conditions might make experience there a poor indication of the times applicants could provide on the routes they sought to enter.").  The record here fails to provide even "that minimal level of analysis," <u>Encino Motorcars, LLC v. Navarro</u>, 579 U.S. ___, ___, 136 S. Ct. 2117, 2125 (2016), required by <u>Bowman Transportation</u>.

supported an agency's decision. '[W]e may not supply a reasoned basis for the agency's action that the agency itself has not given.'" Encino Motorcars, 579 U.S. at ___, 136 S. Ct. at 2127 (quoting State Farm, 463 U.S. at 43).[19]

The opinion of the Court's defense of the future donor improvements portion of the regulation is unpersuasive. The Court observes that "[t]he preamble to the final regulations states that, '[a]fter consideration of all comments regarding the proposed amendments * * * , those amendments are adopted as revised by this Treasury decision,'" see op. Ct. p. 20 (quoting T.D. 8069, 1986-1 C.B. at 90), and also notes that "[t]his Court has found a similar statement, coupled with the administrative record, sufficient to find that Treasury had considered the relevant matter presented to it," see id. (citing Wing v. Commissioner, 81 T.C. 17, 31-32 (1983)). But as the U.S. Court of Appeals for the Sixth Circuit has observed,

_____

[19]The opinion of the Court notes that NYLC "offered no suggestion about how the subject of donor improvements might be handled; it simply recommended 'deletion of the entire extinguishment provision.'" See op. Ct. p. 22. If the Court means to suggest that a comment may be disregarded unless it proposes specific text for how the regulation should be changed, that is not required by the APA. Once a commenter brings a relevant and significant issue to the agency's attention, it is the agency's responsibility to determine how that comment should be implemented. The agency cannot rely on the public to do its homework. See Home Box Office, 567 F.2d at 35-36 ("[T]he opportunity to comment is meaningless unless the agency responds to significant points raised by the public." (Emphasis added; fn. ref. omitted.)).

"[w]e are not required to 'take the agency's word that it considered all relevant matters.'" PPG Indus., 630 F.2d at 466 (quoting Asarco, Inc. v. EPA, 616 F.2d 1153, 1160 (9th Cir. 1980)). Moreover, the opinion of the Court's reliance on Wing is misplaced, as that case was decided before the Supreme Court and the Courts of Appeals had articulated fully the framework for judicial review of legislative rules under the procedural requirements of the APA. See supra Part III.A.

The opinion of the Court also appears to suggest that because "[o]nly one of the 90 commenters mentioned donor improvements, and it devoted exactly one paragraph to this subject," see op. Ct. p. 21, Treasury was not required to respond to it. This is not so. A "relevant and significant comment" requires a response, regardless of whether the point is made by many, a few, or even a single commenter. See, e.g., Carlson, 938 F.3d at 342, 345-349 (invalidating an increase in the price of stamps, in part, on the basis of comments from Douglas Carlson, "a postal customer and watchdog"). Moreover, a comment does not lose its significance because it is presented succinctly. After all, the Commissioner can hardly complain about NYLC's brevity in this case. The Commissioner's own position with respect to future donor improvements is based on a single sentence, and NYLC's comments on this issue were certainly longer than a sentence. In

addition, the Commissioner's actions belie any claim that the comment did not raise a significant issue. As Oakbrook observes in its "Reply to Memorandum Regarding the Validity of Treas. Reg. Section 1.170A-14(g)(6)(ii)," "[i]t is disingenuous for Respondent to now argue that comments regarding the * * * [regulation at issue] are not 'significant,' when Respondent has repeatedly denied taxpayers' deductions for failure to comply with" that regulation.

The opinion of the Court also seems to suggest that the scope of the project--the fact that it included "10 paragraphs, 23 subparagraphs, 30 subdivisions, and 21 examples," see op. Ct. p. 24--somehow excuses Treasury's failure to respond to comments on the provision at issue here. But Treasury chose the scope of the project. If the project was too large to permit an appropriate response to all "relevant and significant comments," then Treasury could have broken the project down into smaller parts. What it could not do is avoid the "dialogue" required by the APA and say nothing about "significant points raised by the public." Home Box Office, 567 F.2d at 35-36 (fn. ref. omitted). As the opinion of the Court acknowledges, the "detail required in a statement of basis and purpose depends on the subject of the regulation and the nature of the comments received." See op. Ct. p. 24 (quoting Reytblatt v. U.S. Nuclear Regulatory Comm'n, 105 F.3d 715, 722 (D.C. Cir. 1997)). Although "[t]his statement need

only 'contain sufficient information to allow a court to exercise judicial review,'" see id. (quoting United States v. Garner, 767 F.2d 104, 117 (5th Cir. 1985)), it does require some information. And here Treasury offered no response at all.

Finally, I note that this would not be the first case in which a court invalidated a Treasury regulation on procedural grounds, as the opinion of the Court acknowledges. See id. note 4. Oakbrook's "Reply to Memorandum Regarding the Validity of Treas. Reg. Section 1.170A-14(g)(6)(ii)" cites, at 5 and 6, the U.S. Court of Appeals for the Federal Circuit's decision in Dominion Res., Inc. v. United States, 681 F.3d 1313, 1319 (Fed. Cir. 2012). That decision held (in Part V) that "[t]he associated-property rule in Treasury Regulation § 1.263A-11(e)(1)(ii)(B) as applied to property temporarily withdrawn from service also violates the State Farm requirement that Treasury provide a reasoned explanation for adopting a regulation."[20] Id.; see also id. at 1320 (Clevenger, J., concurring in part and concurring in the result) ("There appears to be no dispute among the panel that the government has not articulated any rational explanation for many details of the regulation before us, from the regulation's first proposal in

_____

[20]In addition to holding that the regulation at issue failed to satisfy Motor Vehicle Mfrs Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co., 436 U.S. 29 (1983), the majority in Dominion Res., Inc. v. United States, 681 F.3d 1313 (Fed. Cir. 2012), held that the regulation failed under step two of the Chevron analysis, hence the "also" in the quotation above.

the mid-'90s up to the current date. Such a failure makes the regulation procedurally unlawful. I would reverse on the grounds set forth in part V of the majority opinion[.]"). The opinion of the Court attempts to distinguish <u>Dominion Resources</u> from this case on the ground that the majority in <u>Dominion Resources</u> also held that the regulation there failed under step two of <u>Chevron</u>. <u>See</u> op. Ct. note 4. But that distinction does not carry the day. The procedural holding in the case was an independent ground for the decision, as the concurring judge made clear.[21] <u>See</u> <u>Woods v. Interstate Realty Co.</u>, 337 U.S. 535, 537 (1949) ("[W]here a decision rests on two or more grounds, none can be relegated to the category of obiter dictum." (citing <u>United States v. Title Ins. & Tr. Co.</u>, 265 U.S. 472, 486 (1924), and <u>Massachusetts v. United States</u>, 333 U.S. 611, 623 (1948))).

---

[21]Judge Clevenger disagreed with the majority's decision to reach the <u>Chevron</u> step two analysis, observing:

> The outcome of this case can and should extend from <u>State Farm</u>. The government's failure to justify its regulation <u>ab initio</u> left open the question of whether the avoided cost principle necessarily undermines any rationale that could justify treating an adjusted basis of property withdrawn from service for improvement as a production expenditure, for purposes of calculating interest to be capitalized. Such reaffirms my conclusion that this appeal does not present an appropriate vehicle for deciding the <u>Chevron</u> question. It is therefore a more discreet approach to leave that question aside. * * *

<u>Dominion Res.</u>, 681 F.3d at 1322 (Clevenger, J., concurring in part and concurring in the result).

Treasury's procedural missteps here are similar to, and perhaps more significant than, those in Dominion Resources.[22]

Returning to the facts of this case, if Treasury had paid closer attention to the NYLC Comment Letter, it might have course-corrected and adopted a formula that properly accounted for future donor improvements and foreclosed the categorical interpretation advanced by the Commissioner in this case. That is after all why the APA requires agencies "to provide a meaningful opportunity for comments, which means that the agency's mind must be open to considering them." Grand Canyon, 154 F.3d at 468 (citing McLouth, 838 F.2d at 1323). By failing to do so here, Treasury did itself a disservice.

For the reasons set out above, I believe the donor improvements rule, as read by the Commissioner, is inconsistent with the procedural requirements of the APA. "When an administrative agency sets policy, it must provide a reasoned explanation for its action. That is not a high bar, but it is an unwavering one. Here, * * * [Treasury] has failed to meet it." Judulang, 565 U.S. at 45. With respect, I cannot agree with the Court's contrary conclusion.

---

[22]Treasury's failure to comply with the procedural requirements of the APA also resulted in the invalidation of a temporary regulation issued under section 7874. See Chamber of Commerce v. IRS, No. 1:16-CV-944-LY, 2017 WL 4682050 (W.D. Tex. Oct. 6, 2017).

\*   \*   \*

I end where I began.  The ultimate question before the opinion of the Court is whether Oakbrook is entitled to the charitable contribution deduction it claimed on the basis of the easement it granted to SRLC.  As I have explained, applying the text of the statute to the terms of that easement leads to the conclusion that the easement is not a "qualified conservation contribution."  Accordingly, Oakbrook is not entitled to a charitable contribution deduction.  That conclusion fully resolves the dispute before us.  The remaining issues raised by the parties present "perplexing questions," on which the members of this Court do not agree.  As Justice Frankfurter once cautioned, "[t]heir difficulty admonishes us to observe the wise limitations on our function and to confine ourselves to deciding only what is necessary to the disposition of the immediate case."  <u>Whitehouse</u>, 349 U.S. at 372-373.  That is what I would have done.  Because the Court does otherwise, I respectfully concur only in the result.

GUSTAFSON, <u>J</u>., agrees with parts I, II.A, and II.B of this concurring opinion, URDA, <u>J</u>., agrees with this concurring opinion, and JONES, <u>J</u>., agrees with part I of this concurring opinion.

HOLMES, J., dissenting:  Our holding today will likely deny any charitable deduction to hundreds or thousands of taxpayers who donated the conservation easements that protect perhaps millions of acres.  See Oakbrook Land Holdings, LLC v. Commissioner, T.C. Memo. 2020-54, at *7 n.2.  This is the second time we've taken an ax to entire forests of these deductions.  In Pine Mountain Pres., LLLP v. Commissioner, 151 T.C. 247 (2018), appeal filed (11th Cir. May 7, 2019), we went ahead and held that reserving a limited right to build on conserved property--unless the site is described with exceptional precision--destroys any deduction for the donation, knowing that we were setting up a conflict with the only circuit court to rule on the issue.  See id. at 272-73 (stating that we will not follow BC Ranch II, L.P. v. Commissioner, 867 F.3d 547 (5th Cir. 2017), vacating and remanding Bosque Canyon Ranch, L.P. v. Commissioner, T.C. Memo. 2015-130).

In today's case, we hold that the Treasury Department gets to ignore basic principles of administrative law that require an agency "to give reasoned responses to all significant comments in a rulemaking proceeding."  PPG Indus., Inc. v. Costle, 630 F.2d 462, 466 (6th Cir. 1980).  A court is supposed to ensure that an agency has taken "a 'hard look' at all relevant issues and considered reasonable alternatives."  Simms v. Nat'l Highway Traffic Safety Admin., 45 F.3d 999, 1004

(6th Cir. 1995) (quoting <u>Neighborhood TV Co., Inc. v. FCC</u>, 742 F.2d 629, 639 (D.C. Cir. 1984)). But if the majority is right, the Treasury Department can get by with the administrative-state equivalent of a quiet shrug, a knowing wink, and a silent fleeting glance from across a crowded room.

This is not the way rulemaking is supposed to be. And it is not the way that the Article III courts, including the court to which an appeal of this case lies, review the validity of regulations. To explain what we should have done, I

- briefly review some general principles of administrative law that are relevant here,

- explain why this regulation is procedurally invalid,

- suggest that even if procedurally valid its thin administrative record might make it substantively invalid, and

- summarize where this leaves conservation-easement-deduction law after today.

I.

A.

We begin by blazing through this thicket to where the trails of administrative and procedural law meet. The majority mentions the age of this regulation as a reason to uphold it. <u>See</u> op. Ct. pp. 31-33. But when could it have

been challenged?[1]  Title 28 U.S.C. section 2401(a) provides that, with limited exceptions not relevant here, "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."

Treasury issued the regulation at issue in 1986.  See 51 Fed. Reg. 1496 (Jan. 14, 1986).  Oakbrook was formed in August 2007 and filed its petition in March 2013, within six years of the regulation's first invading its interest.[2]  And the Sixth Circuit has held that 28 U.S.C. "[s]ection 2401(a) does not limit a federal court's subject-matter jurisdiction."  Herr v. U.S. Forest Serv., 803 F.3d 809, 818

---

[1] The Ninth Circuit asked this question even when the parties didn't raise it. See Order, Sept. 28, 2018, at 1, Altera Corp. v. Commissioner, 926 F.3d 1061 (9th Cir. 2019) (Nos. 16-70496, 16-70497) (ordering the parties to be prepared to discuss whether the six-year statute of limitations should be applicable to a tax regulation, as well as offering the opportunity to file supplemental briefs on the question).

[2] The Anti-Injunction Act (AIA) prohibits taxpayers from bringing suit "for the purpose of restraining the assessment or collection of any tax."  Sec. 7421(a). Courts interpret this language to mean that the AIA "generally bars pre-enforcement challenges to certain tax statutes and regulations."  Fla. Bankers Ass'n v. U.S. Dep't of Treasury, 799 F.3d 1065, 1066 (D.C. Cir. 2015).  This does make tax law exceptional, but even on this topic there has been one powerful dissental, see CIC Servs., LLC v. IRS, 925 F.3d 247, 259-61 (6th Cir. 2019) (Nalbandian, J., dissenting), cert. granted, __ U.S. __, __ S. Ct. __, 2020 WL 2105208 (May 4, 2020), and academic analysis, see Kristin E. Hickman & Gerald Kerska, "Restoring the Lost Anti-Injunction Act", 103 Va. L. Rev. 1683 (2017), that suggest a change may be coming.  We, of course, look to the law as it currently is.

(6th Cir. 2015). The age of this regulation is no obstacle to challenging its validity here.

This is a shallow root that Oakbrook can just stroll over.

## B.

With this pop quiz in civil procedure over, we can graduate to Ad Law 101. As a general matter, for a regulation--including tax regulations--to be valid its promulgation must comply with the notice-and-comment procedures of the Administrative Procedure Act (APA).[3] See 5 U.S.C. sec. 553(a)-(c) (2006); Perez v. Mortg. Bankers Ass'n, 575 U.S. 92, 96 (2015); Mayo Found. for Med. Educ. & Research v. United States, 562 U.S. 44, 55 (2011) ("[W]e are not inclined to carve out an approach to administrative review good for tax law only. To the contrary, we have expressly '[r]ecogniz[ed] the importance of maintaining a uniform approach to judicial review of administrative action.'" (quoting Dickinson v. Zurko, 527 U.S. 150, 154 (1999))); Children's Hosp. of the King's Daughters, Inc. v. Azar, 896 F.3d 615, 619-20 (4th Cir. 2018). If a regulation is promulgated properly under notice-and-comment procedures, we must next look to review the

---

[3] Notice-and-comment procedures apply only to "legislative rules"--i.e. rules with the force of law. See Perez v. Mortg. Bankers Ass'n, 575 U.S. 92, 96 (2015). I agree with the majority that this rule, even though the Treasury Department called it "interpretive", is actually "legislative" and, therefore, notice-and-comment procedures apply. See op. Ct. pp. 16-17.

substance of the agency action--i.e., does the agency action run counter to the statutory language, see Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984), or was the agency's decision making arbitrary and capricious, see APA sec. 706(2)(A); Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 46 (1983).  Only if we find that the agency's action complied with APA section 553 do we then apply the arbitrary-and-capricious standard of APA section 706(2)(A), see HLI Lordship Indus., Inc. v. Comm. for Purchase from the Blind & Other Severely Handicapped, 791 F.2d 1136, 1140 (4th Cir. 1986) ("The 'concise general statement' mandated by [APA section] 553(c), and other procedural requirements, are preconditions to the highly deferential 'arbitrary and capricious' standard of review."), or Chevron's related standard.[4]

And, as a general point, the agency's articulation for a regulation's validity must be contemporaneous with its issuance of the final rule and within the administrative record, because a reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given."  State Farm, 463 U.S. at 43; see also Atrium Med. Ctr. v. HHS, 766 F.3d 560, 568 (6th Cir. 2014) ("[A]n

---

[4] But, as Justice Thomas has argued, the Chevron two-step may even be contrary to the APA itself.  See Baldwin v. United States, 589 U.S. __, __, 140 S. Ct. 690, 692 (2020) (Thomas, J., dissenting from denial of certiorari).

agency cannot bolster its case with rationales offered post hoc"). This is not to say that an agency must perfectly articulate its reasons for choices made, as a court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974). "But where the agency has failed to provide *even that minimal level of analysis*, its action is arbitrary and capricious." Encino Motorcars, LLC v. Navarro, 579 U.S. __, __, 136 S. Ct. 2117, 2125 (2016) (emphasis added).

Oakbrook's main argument is directed towards Treasury's alleged procedural shortcomings in promulgating section 1.170A-14(g)(6)(ii), Income Tax Regs. The foundation of this argument is that Treasury failed to provide a reasoned basis in the administrative record for its action. Oakbrook argues that this not only makes it "difficult to discern the meaning of the Regulation, [or] how to apply it in practice," but frustrates any meaningful analysis of "whether the [Treasury]'s action in promulgating the Regulation is arbitrary and capricious." This argument goes to the heart of Treasury's rulemaking procedure under the APA and may be of decisive importance because only regulations issued in a valid manner are eligible for deference. See Encino Motorcars, 579 U.S. at __, 136 S. Ct. at 2125. There are no special procedural rules for tax regulations--we have

to look to the APA, which itself "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009).

On this point, I do agree with the majority, which correctly points out, see op. Ct. p. 17, that APA section 553 has three requirements for an agency that wants to issue regulations through informal rulemaking. It must (1) publish a notice of proposed rulemaking in the Federal Register; (2) provide the public with an opportunity to participate in the rulemaking--commonly through the submission of written comments; and (3) after consideration of relevant public submissions, publish the final rule and a concise statement of its basis and purpose. APA sec. 553(b)-(c). But the majority, I fear, has missed the main root of Oakbrook's argument--that at the time of the regulation's promulgation, commenters made significant comments, and Treasury failed to address them in its statement of the regulation's basis and purpose. See, e.g., Reytblatt v. U.S. Nuclear Regulatory Comm'n, 105 F.3d 715, 722 (D.C. Cir. 1997) (basis and purpose statement inextricably intertwined with receipt of comments); United States v. Nova Scotia Food Prods. Corp., 568 F.2d 240, 252 (2d Cir. 1977) ("concise general statement" required by APA section 553(c) is inadequate when material comments are left completely unanswered).

II.

With these general principles in place, one can turn to the merits of Oakbrook's procedural challenge to the regulation--that Treasury failed to respond to significant comments relating to section 1.170A-14(g)(6)(ii), Income Tax Regs.

A.

Let's turn first to the comments sent to Treasury while it contemplated the regulation before us.[5] Treasury received approximately 90 comments regarding the substance of the proposed section 170A regulations.[6] Among those, the following commenters specifically expressed concern with what is now section 1.170A-14(g)(6)(ii), Income Tax Regs.:

- New York Landmarks Conservancy;

- Philadelphia Historic Preservation Corporation;

- The Trust for Public Land;

- Landmarks Preservation Council of Illinois;

---

[5] We directed the Commissioner to provide the comments that the public submitted during the rulemaking proceeding. He filed the entire administrative record for T.D. 8069, 1986-1 C.B. 89, in which the Final Rule was published. That record amounted to over 2,500 pages, and included over 550 pages of submissions from the public.

[6] This number excludes timely comments that asked only to participate in the public hearing.

- Maine Coast Heritage Trust;

- The Nature Conservancy;

- Western Pennsylvania Conservancy;

- Brandywine Conservancy, Inc.;

- Hofstra University;

- Natural Lands Trust, Inc.;

- National Trust for Historic Preservation;

- The Washington Trust for Historic Preservation; and

- Land Trust Exchange.

These commenters raised a variety of potentially significant issues with the proposed rule, but I focus only on those relevant to Oakbrook's challenge here: Why did Treasury choose to require that a donee receive a proportionate share rather than a fixed sum if the easement is extinguished or condemned? And why did Treasury choose to require that a donee share in the value added to the property by later improvements to it? (We'll follow the majority's shorthand and call these the problems of proportionate share and donor improvements.) The comments submitted by the New York Landmarks Conservancy (NYLC) addressed these questions most extensively. According to the NYLC, "[t]he provisions for apportionment of proceeds in the case of extinguishment of a

conservation restriction * * * contain problems of policy and practical application so pervasive as to cause us to recommend strongly the deletion of these provisions." Respondent's Response to Order Dated 02/27/2019, Administrative Record (Response to Order) at 373, Oakbrook Land Holdings, LLC v. Commissioner, T.C. Memo. 2020-54.

The NYLC identified four specific "inequities" with the provisions. First, it believed that the provisions would deter prospective donors from donating conservation easements if they were required to share extinguishment proceeds at some indeterminate time under unforeseen circumstances. Id. From its experience, the common-law doctrine of changed conditions allayed such concerns among easement donors but, as proposed, the extinguishment provisions "would no longer mollify these fears if a split of proceeds under unknown circumstances would be required." Id. at 374; see also Oakbrook, T.C. Memo. 2020-54, at *14-*16 (also discussing "changed conditions" as it applies to conservation easements under common law).

Second, it felt that provisions in the proposed regulations that recognized a property right vested in the donee improperly assumed that a conservation easement represented a positive economic value to donees because of the

possibility that donees might one day receive proceeds from extinguishment.[7]  See

Response to Order at 374.  It argued that any such assumption was "unrealistic"

since "[t]he value of a conservation restriction to the donee organization is not a

monetary value but a philanthropic value as a device for achieving the charitable

objectives of the organization."  Id.  So while the NYLC acknowledged it would

welcome the receipt of extinguishment proceeds, it preferred the elimination of the

provision because it believed that its deterrent effect on potential donors would

harm conservancies more than "the prospect of future windfalls when restrictions

are extinguished" might benefit them.  Id.

The NYLC identified as a third problem the potential conflict between the

proposed rule and state condemnation law.  Id. at 375.  To illustrate its concern, it

---

[7] The Western Pennsylvania Conservancy (WPC) and the Maine Coast Heritage Trust (MCHT) also identified this assumption as a problem with the proposed rule and suggested that it could have untoward accounting and tax consequences.  Both argued that conservation easements have a negative economic value because donees have to pay the cost of monitoring and enforcing compliance with their restrictions, while being unable to sell them except in the narrowest of circumstances.  To suggest otherwise, the MCHT claimed, is not only "misleading" but could actually "jeopardize its status as a publicly-supported charity" if it were required to report conservation easements as massive assets or contributions on its Form 990, Return of Organization Exempt From Income Tax.  Response to Order at 511.  The WPC raised the somewhat related concern that the implication of the regulation might "require donors or conservancies to pay transfer taxes--yet another significant cumulative burden which * * * will weigh heavily against the utility of this conservation tool."  Id. at 783.

gave an example where an easement is extinguished upon condemnation. It claimed that in such a situation "state law would operate to determine whether the conservation organization's restriction had a compensable value." Id. The problem, it argued, is that "[i]t is possible that some states would not provide compensation for such a property interest, yet under the proposed regulation, the owner of the condemned property would be required to share the condemnation proceeds with the conservation organization." Id.

The NYLC had one final concern--that "[t]he structure of [section 1.170A-14(g)(6)(ii), Income Tax Regs.,] contemplates that a ratio * * * will be fixed at the time of the donation" but that the "formula fails to take into account that improvements may be made thereafter by the owner which should properly alter the ratio." Id. at 374. The NYLC then provided an example where a donor improves the donated property after the gift and the donee shares in the value of those improvements upon extinguishment, which it argued "would obviously be undesirable to the prospective donor and would constitute a windfall to the donee organization." Id. This is precisely the argument that Oakbrook makes regarding the allocation of extinguishment proceeds attributable to improvements.

Not all commenters, however, agreed with the NYLC on this point--but even they requested more clarity. Both the Nature Conservancy and the MCHT

felt that the proposed rule needed to clarify that donees would be entitled upon

extinguishment to both the original proportionate value and any subsequent

increase in value attributable to market forces. See id. at 511, 579. The

Brandywine Conservancy, Inc., made a similar argument and stated that the

proposed rule would "unnecessarily restrict the amount payable to the holder of an

easement, if changes in surrounding territory have made the easement

proportionately more valuable than the retained interest." Id. at 593. That

conservancy argued that the rule should be changed so that a donee is "entitled to

proceeds equal to the *greater* of its original proportionate value or its

proportionate value at the time of the extinguishment." Id.

The Trust for Public Land (TPL) questioned whether the provision for the

allocation of extinguishment proceeds could be enforced against anyone other than

the original donor, but also felt that the regulations imposed an undue burden on

donors in light of the tax-benefit rule and the remote-future-event rule.[8] TPL

thought those rules would adequately address Treasury's concerns. Id. at 844. It

_____

[8] "[T]he tax benefit rule ordinarily applies to require the inclusion of income when events occur that are fundamentally inconsistent with an earlier deduction." Hillsboro Nat'l Bank v. Commissioner, 460 U.S. 370, 372 (1983). The remote-future-event rule permits a charitable-contribution deduction only if, on the date of donation, the possibility that the donee's vested interest "may be defeated by the performance of some act or happening of some event * * * is so remote as to be negligible." Sec. 1.170A-14(g)(3), Income Tax Regs.

suggested that the "tax benefit rule is a satisfactory means of meeting any concern the IRS may have that a donor might receive the double benefit of an easement deduction followed by later recovery of the value donated." Id. TPL also suggested that the remote-future-event rule should sufficiently assuage any concern that conservation easements might not be protected in perpetuity, because it would bar a deduction if a donor knows at the date of donation that a change in circumstances will occur in the foreseeable future that will extinguish the easement. Id.

These are multiple serious comments that identified problems with the regulation when it was proposed and explained why those problems mattered. Comments with this level of detail and dispute among the commenters would seem enough to conclude that Treasury had before it "significant" comments. Such comments deserve responses.

We turn our attention to Treasury's response.

## B.

What we hear is the chirping of crickets.

The Final Rule's statement of basis and purpose shows absolutely no mention of the extinguishment-proceeds clause at all, much less any mention of the proportionate-share or improvements problems--and no reasoned response to

any of the public's comments on those provisions.[9] The majority doesn't deny

this, see op. Ct. pp. 23-25, and we aren't even the first court to notice: In

Kaufman v. Shulman, 687 F.3d 21, 26 (1st Cir. 2012), the First Circuit was forced

to guess at the apparent purpose of the section 1.170A-14(g)(6)(ii), Income Tax

Regs., after noting that it "was unexplained when first promulgated."

This makes the defining characteristic of section 1.170A-14(g)(6)(ii),

Income Tax Regs., its utter lack of any contemporaneous explanation of its key

choices--to require that donees get a fraction, rather than an absolute amount, of

extinguishment proceeds and to require that they get a share of any proceeds from

a donor's improvements to the property. There is no prefiguring of these choices

in the legislative history or the notice of proposed rulemaking, and no explanation

of them in the Final Rule. Had Treasury responded in any meaningful way to the

comments that it received, such as those from the NYLC, neither donors and

donees, nor courts, see, e.g., Oakbrook, T.C. Memo. 2020-54, at *20-*28

(highlighting the confusing nature of section 1.170A-14(g)(6), Income Tax Regs.,

---

[9] At least one commenter had also noticed that the proposed regulation might cause special problems for conservation easements aimed at preserving building facades. The Philadelphia Historic Preservation Corporation argued that "[t]he provisions relating to extinguishment of easements * * * are a bit perplexing and * * * unreasonable as applied to facade easements." Response to Order at 770. Treasury didn't respond to this comment either.

and attempting to discern its meaning), nor the IRS, <u>compare</u> Priv. Ltr. Rul. 200836014 (Sept. 5, 2008) (stating that the regulation isn't violated by a conservation easement in which a donee receives only proceeds less any amount attributable to an improvement), <u>with</u> <u>Oakbrook</u>, T.C. Memo. 2020-54, at *36 (addressing the IRS's argument that a conservation easement in which a donee receives only proceeds less any amount attributable to an improvement is a violation of the regulation), would have to grapple with whether "proportionate value" establishes a fraction or a fixed value, or whether a donee is entitled to any extinguishment proceeds attributable to the value of improvements or rising land values. Such widespread industry confusion is precisely what APA section 553 is intended to avoid. So while we don't demand a perfect explanation for Treasury's decisionmaking, <u>see</u> <u>Bowman Transp.</u>, 419 U.S. at 286, we should demand some, <u>see</u> <u>Encino Motorcars</u>, 579 U.S. at __, 136 S. Ct. at 2125. And here, there wasn't any.

C.

But the majority would let the regulation stand despite this silence. It argues in turn that:

- Treasury didn't need to respond to these comments because the statement of basis and purpose made obvious what it was doing, see op. Ct. pp. 23-24;

- even if Treasury wasn't obvious in what it was doing, it did say it considered "all comments" and that's good enough, see id. p. 20; and

- even if it didn't say that it considered "all comments" it did make some changes to the proposed regulation from which we can infer its response to them, see id. p. 21.

Let's look at each point.

1.

The majority argues that Treasury didn't need to respond to comments regarding section 1.170A-14(g)(6)(ii). In fact, it had "no doubt" that Treasury considered the relevant matter--the agency had responded to most of the comments that it received on other parts of the rulemaking, and no agency has to address all the comments it receives. See op. Ct. pp. 23-24. I address this argument somewhat in reverse. There are cases that say that not every comment has to be addressed--how could it be otherwise when there are some rules that receive more

than one million comments?[10]  See Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37057 (June 29, 2015).[11]  In the modern era, agencies can receive comments over the internet and run deduplicating software to make their jobs easier.  See Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs, "Abuses of the Federal Notice-and-Comment Rulemaking Process" 13-16 (Oct. 4, 2019).  They can group comments that are similar or identical, and they can distill comments to fairly paraphrase the key points that they make.  I therefore agree with the majority that no court has ever construed the APA to require a response to every comment separately, and that courts have construed the APA to require an agency's response to be based on the nature of the comments it has received.  See op. Ct. p.

---

[10] Compared to what the EPA and FCC receive, 700 pages of even "voluminous" commentary from only 90 commenting organizations, see op. Ct. p. 11, is rather small.  Agencies frequently have to deal with more commenters and more pages of comments.  See, e.g., 84 Fed. Reg. 68834 (Dec. 17, 2019) (receiving over 7,700 comments on a proposed Treasury regulation dealing with section 162, 164, and 170A); 84 Fed. Reg. 2952, 2952-53 (receiving 335 comments related to 199A regulations).

[11] So many comments can crash an agency's website.  See Soraya Nadia McDonald, "John Oliver's Net Neutrality Rant May Have Caused FCC Site Crash", Washington Post, June 4, 2014 (describing how John Oliver encouraged his viewers to comment on the FCC's proposed net-neutrality rule and the system subsequently stopped working because of more than 45,000 new comments that came in).

24; see also Reytblatt, 105 F.3d at 722 (quoting Action on Smoking and Health v. CAB, 699 F.2d 1209, 1216 (D.C. Cir. 1983)).

But the analysis shouldn't stop there--what is the *nature* of a comment that triggers an agency's obligation to respond? The caselaw tells us to look at a comment's *significance*. Agencies must "give reasoned responses to *all significant comments* in a rulemaking proceeding." PPG Indus., 630 F.2d at 466 (emphasis added); see also Perez, 575 U.S. at 96 ("An agency must consider and respond to *significant comments* received during the period for public comment." (emphasis added)); Interstate Nat. Gas Ass'n of Am. v. FERC, 494 F.3d 1092, 1096 (D.C. Cir. 2007) (agencies must "give reasoned responses to *all significant comments*" (emphasis added)). This is because "the opportunity to comment is meaningless unless the agency responds to *significant* points raised by the public." Home Box Office, Inc. v. FCC, 567 F.2d 9, 35-36 (D.C. Cir. 1977) (emphasis added) (citing Portland Cement Ass'n v. Ruckelshaus, 486 F.2d 375, 393-94 (D.C. Cir. 1973)); see also Nova Scotia, 568 F.2d at 252 ("It is not in keeping with the rational process [of APA section 553(c)] to leave vital questions, raised by comments which are of cogent materiality, completely unanswered"). So, though an agency doesn't have to respond to all comments, it must respond to all *significant* comments.

This makes it important to figure out which comments are "significant" and which are not. The majority doesn't even address whether the comments here are significant.[12] But it implies that the only comments that are significant are those that "suggest alternative text." See op. Ct. pp. 13-14, 22 n.3. It gives no cite for this, nor could it do so, because there is not a precise definition in the caselaw--rather there are themes.

One is that an agency should address why it rejected proffered alternatives. See Indep. U.S. Tanker Owners Comm. v. Dole, 809 F.2d 847, 852 (D.C. Cir. 1987) (stating that the Secretary failed to address why alternative measures were rejected); Nova Scotia, 568 F.2d at 253 ("Though this alternative was suggested by an agency of the federal government, its suggestion, *though acknowledged*, was never answered" (emphasis added)).

---

[12] The majority focuses instead on whether Treasury considered relevant matter (which the majority has "no doubt" that it did) and whether the basis and purpose is obvious. See op. Ct. pp. 23-24. To support this proposition the majority cites Cal-Almond, Inc v. U.S. Dept. Of Agric., 14 F.3d 429, 443 (9th Cir. 1993). See op. Ct. p. 24. In Cal-Almond, however, the agency had altogether ignored notice-and-comment procedures; the question was whether this failure was harmless error. Cal-Almond, 14 F.3d at 441. There wasn't even a proposed rule to comment on--interested parties had the opportunity to submit input only orally at an open board meeting. See 45 Fed. Reg. 56795 (Aug. 26, 1980). There is nothing in that opinion about how to gauge whether a comment was significant and whether the agency's response when it issued its final rule was adequate.

Another theme is that it is not rational to "leave vital questions, raised by comments which are of cogent materiality, completely unanswered." Nova Scotia, 568 F.2d at 252. I agree that "[w]e do not expect the agency to discuss every item of fact or opinion included in the submissions made to it in informal rulemaking." Id. (quoting Auto. Parts & Accessories Ass'n, Inc. v. Boyd, 407 F.2d 330, 338 (D.C. Cir. 1968)). But we should be able to "see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them as it did." Id. (quoting Auto. Parts, 407 F.2d at 338). We should be able to see why Treasury "[chose] to follow one course rather than another." See Indus. Union Dep't, AFL-CIO v. Hodgson, 499 F.2d 467, 475 (D.C. Cir. 1974).

Significant comments are also those "which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule." Home Box Office, 567 F.2d at 35 n.58. Significant comments are not just those that include drafts of alternative regulatory language, but those that identify a specific and objective issue created by the language of the proposed rule and give some explanation for why that language is troublesome. Think of this as the what and why test: (1) *what* is the problem; and (2) *why* is it a problem? A comment is thus more likely to be significant if the commenter suggests a remedy for the purported problem it identifies. Insignificant comments,

on the other hand, are those which are "purely speculative and do not disclose the factual or policy basis on which they rest." Id. In the absence of significant comments or an explicit congressional directive, there is no requirement that "an agency engage in and document an exhaustive review of hypothetical 'aspect[s] of the problem.'" SIH Partners LLLP v. Commissioner, 150 T.C. 28, 47 (2018), aff'd, 923 F.3d 296 (3d Cir. 2019); see also Thompson v. Clark, 741 F.2d 401, 408 (D.C. Cir. 1984) ("[APA section 553(c)] has never been interpreted to require the agency to respond to every comment, or to analy[z]e every issue or alternative raised by the comments, no matter how insubstantial").

When it came to the proportionate-share and donor-improvements issues, the Treasury received several comments. The NYLC believed that the regulation "contain[ed] problems of policy and practical application so pervasive as to cause us to recommend strongly the deletion of [the] provisions." Response to Order at 373. The NYLC didn't stop there, but rather identified four specific inequities with the provision:

- it would deter prospective donors from donating conservation easements, id.;

- the provision improperly assumed that a conservation easement represented a positive economic value to donees based on the possibility that the donees might one day receive proceeds from extinguishment, id. at 374;

- there was a potential conflict with the provision and state condemnation law, id. at 375; and

- the ratio fails to take into account improvements made by the owner after donation which should alter the ratio, id. at 374.

TPL agreed with the NYLC--believing that the provision was an undue burden on donors in light of the tax-benefit rule and the remote-future-event rule. Id. at 844. But there were those that disagreed with NYLC's points, including the Nature Conservancy, the MCHT, and Brandywine Conservancy, Inc.--feeling that the donees should be entitled to any subsequent increase in value attributable to market forces.[13] See id. at 511, 579, 593. But even these commenters thought the provision needed to be clearer. Id.

As Oakbrook points out, there were a number of comments on the extinguishment-proceeds regulation that were "significant" under these guidelines. Commenters didn't just say, "Delete the regulation, we don't like it." They wrote in to propose other alternatives to achieve the Code's requirement that the conservation purpose of a donated easement be preserved "in perpetuity."

---

[13] The majority incorrectly asserts that only NYLC mentioned donor improvements. See op. Ct. p. 13. But TPL, Nature Conservancy, MCHT, and Brandywine Conservancy also mention them. See Response to Order at 511, 579, 593, 844.

These alternatives included reliance on the common-law doctrines of changed conditions to deal with the remote contingency of condemnation or judicial extinguishment. Another comment proposed reliance on the tax-benefit rule or the remote-future-event rule instead of the challenged regulation. Some pointed out that the proportionate-value rule might overcompensate donees and discourage donations, which might be thought of as contrary to the evident policy of section 170A to encourage donations of genuine conservation easements. The NYLC thought that requiring the cost of improvements to be ignored in splitting up proceeds would lead to a windfall to donees.

The majority seems to conclude that these comments were *not* significant in the specific sense in which the caselaw defines the concept: A comment "which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an agency's proposed rule * * * ." Home Box Office, 567 F.2d at 35 n.58. Looking at the comments offered here--which identified inequities with the regulation, suggested alternatives, identified potential negative effects on the willingness of donors to make donations, uncovered potential conflicts with state law, and simply asked for more clarity--this is a bewildering conclusion. Under the caselaw, the comments made were significant and are entitled to an agency response.

The majority though says no sweat--even if these comments are significant, Treasury did respond to them by stating in the preamble that it considered "all comments" and by making changes to the proposed regulation.

2.

Before determining whether the agency's response here was adequate, one must first look to caselaw to determine what an adequate response even looks like. Generally, the point of the APA's procedural rules for notice-and-comment rule-making is to ensure that "there [] be an exchange of views, information, and criticism between interested persons and the agency." Home Box Office, 567 F.2d at 35. The notice-and-comment procedure promotes the quality of agency rules and "ensure[s] fair treatment for persons to be affected by" them. Dismas Charities, Inc. v. U.S. Dep't of Justice, 401 F.3d 666, 678 (6th Cir. 2005); see also United States v. Cain, 583 F.3d 408, 420 (6th Cir. 2009). It also provides courts with a meaningful opportunity to "see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them as it did." Simms, 45 F.3d at 1005 (quoting Auto. Parts, 407 F.2d at 338).

This is why in Dominion Resources, Inc. v. United States, 681 F.3d 1313, 1319 (Fed. Cir. 2012), rev'g 97 Fed. Cl. 239 (2011), Treasury's explicit statement that it rejected the commentators' recommendation and brief explanation in

general terms of how one of the provisions worked wasn't enough.  Dominion

Resources reviewed the promulgation of Treasury regulation section 1.263A-

11(e)(1)(ii)(B).[14]  This regulation governed how much interest expense a

corporation had to capitalize--instead of deduct--when it borrowed money to

improve real property.  What made it controversial was that it required the

capitalization of interest incurred to pay not only the cost of an improvement to

real property, but of the interest incurred on the entire basis of the property being

improved while it was offline to add the improvement.  See T.D. 8584, 1995-1

C.B. 20, 26.  A utility company challenged its validity in Dominion Resources, 97

Fed. Cl. 239.

Like the regulation here, the challenged regulation in Dominion Resources

was part of a very large project to implement a new part of the 1986 Code.  As

here, there had been comments on the entire regulation, as well as the specific part

of it that was under attack.  See Dominion Res., 97 Fed. Cl. at 255-56.  Unlike its

---

[14] Finding other procedural challenges to Treasury regulations may prove difficult--it wasn't until 2011 that the Supreme Court definitively pronounced that "we are not inclined to carve out an approach to administrative review good for tax law only.  To the contrary, we have expressly '[r]ecogniz[ed] the importance of maintaining a uniform approach to judicial review of administrative action.'" Mayo Found., 562 U.S. at 55 (quoting Dickinson, 527 U.S. at 154).  The majority though confines its discussion of the most relevant circuit-court case that analyzes how a Treasury regulation can be procedurally defective to a footnote.  See op. Ct. p. 25 n.4.

silence here, Treasury's response to the comments that it'd received on the associated-property rule at issue in <u>Dominion Resources</u> were less laconic.[15] It summarized those comments in the preamble to the final regulation, and it even explained how the challenged part of the regulation would work, although the preamble did "not explain why the commentators' suggestion was rejected." <u>Id.</u> at 256.

The company pointed this out--"Dominion contends that Treasury 'failed to provide any explanation of the reasoning that led it to adopt the associated-property rule.'" <u>Id.</u> at 258. The trial court nevertheless upheld the rule, because Treasury seemed to have made some changes to its text in response to the comments, <u>id.</u> at 259; and Treasury, after summarizing some of the comments, did state "[t]he final regulations do not adopt the suggestion," <u>id.</u> at 256. As that court reasoned, "lack of exactitude and the ensuing confusion do not signify that Treasury acted to establish the final rule in an arbitrary and capricious manner.

---

[15] This rule had the shorthand name of the "associated-property rule" because it governed interest capitalization on the property associated with an improvement that needed to be taken out of service while the improvement was made. <u>See Dominion Res.</u>, 97 Fed. Cl. at 240 (stating the issue of the case required analysis of "the Treasury Department's associated-property rule for capitalizing interest on a taxpayer's installation or construction of improvements or additions to property used to generate income. The associated-property rule relates to property temporarily removed from service in connection with installation or addition of an improvement * * * .")

The 'path' that Treasury was taking in the rulemaking proceedings can be 'discerned,' albeit somewhat murkily." Id. at 259.

And then the case was appealed.

The Federal Circuit reversed.  It was not enough for Treasury to mention or paraphrase the comments that it received, see T.D. 8584, 1995-1 C.B. 20, 26 (summarizing potential issues and alternatives raised by the comments); and it was not enough to provide general statements that a regulation was intended to implement a particular Code section or use a particular method, see id. at 21 (stating regulation designed to reduce complexity without undermining the Code provision).  See Dominion Res., 681 F.3d at 1319.  The problem with the regulation was that a statement that Treasury had rejected a comment, or provided an explanation of how the regulation would work, is not the same as giving *reasons* for rejecting a comment or choosing why to make the regulation work one way instead of another.  It's not "reasoned decision making" without reasons.  See id. (finding that the agency failed to explain the rational connection between the facts and choices made despite statements that it had rejected comments, see T.D. 8584, 1995-1 C.B. at 27, and failed to explain how the regulation worked, see id. at 26).  "An agency must cogently explain why it has exercised its discretion in a given manner."  Dominion Res., 681 F.3d at 1319 (quoting State Farm, 463 U.S.

at 48).  Judge Clevenger summarized the problem more pithily in his concurrence, where he wrote that "the government has not articulated any rational explanation for many details of the regulation before us, from the regulation's first proposal in the mid-'90s up to the current date.  Such a failure makes the regulation procedurally unlawful."  Id. at 1320 (Clevenger, J., concurring).[16]

Oakbrook's argument in this case is stronger--Treasury didn't even acknowledge the relevant comments or expressly state its disagreement with them.  Instead it just ignored them.  There is not even "a minimal level of analysis," as the Supreme Court, just a couple years ago, insisted an agency must show if it hopes to avoid its regulation's being held procedurally invalid.  Encino Motorcars, 579 U.S. at __, 136 S. Ct. at 2120.

Nova Scotia also shows what should happen when an agency doesn't consider significant comments.[17]  There, the court found no concise general

---

[16] The majority misreads Dominion Resources to apply only to regulations that are inconsistent with statutory text.  See op. Ct. p. 25 n.4.  Not so--a regulation that is contrary to the text of a statute is invalid as "not in accordance with law."  APA sec. 706(2)(A).  Treasury's failure to follow the APA's procedural requirements was an independent, alternative reason for invalidating the regulation.  See Dominion Res., 681 F.3d at 1319.

[17] In Nova Scotia, the agency was responding to several cases of botulism in fish.  The challenged regulations required the fish to be cooked at a certain temperature, for a certain time, and in brine of a certain percentage of salinity.

(continued...)

statement of why it was necessary that the regulation apply to all species of fish

and why the regulation was necessary even though it was commercially infeasible

for some fisheries.  Nova Scotia, 568 F.2d at 253.  The court pointed out that the

Treasury failed to address suggested alternatives and was silent about the

comments that asserted the proposed regulations were economically infeasible.  Id.

But what is more illuminating is what the agency in Nova Scotia did do.

The agency did make minor changes from the proposed regulation to the final

regulation to address some comments received.  Id. at 244.  The agency did assure

the reader of the preamble that it had considered the comments that it received.  35

Fed. Reg. 17401 (Nov. 13, 1970).  The agency did summarize those comments.  It

even gave a general reason--that the regulation required for all fish the safest

known procedure to prevent botulism.[18]  Id.

_____

[17](...continued)
Nova Scotia, 568 F.2d at 243-44.

[18] The preamble actually had a fair amount of detail:

Current good manufacturing practice (sanitation) in
manufacture, processing, packing, or holding of smoked and
smoke-flavored fish for human food.
In the FEDERAL REGISTER of October 23, 1969 (34 F.R.
17176), the Commissioner of Food and Drugs proposed regulations
(Subpart A, Part 128a) covering current good manufacturing practice
(sanitation) in the manufacture, processing, packing, or holding of

(continued...)

But those changes and several short paragraphs of explanation were not

enough in <u>Nova Scotia</u>.[19]  And in <u>Oakbrook</u> we don't get several short paragraphs,

---

[18](...continued)
smoked fish. In response, comments were received from two trade associations, eight manufacturers, and the Bureau of Commercial Fisheries, Department of Interior. The comments include opposition to certain requirements and suggestions for clarifying and technical changes.

The principal objection is that the process requirements in the proposed regulations cannot be applied to all species of fish presently being smoked by the industry and that the regulations should therefore specify time-temperature requirements, as developed by re-search and study, on a species-by-species basis.

The Commissioner finds: (1) That although adequate times, temperatures, and salt concentrations have not been demonstrated for each individual species of fish presently smoked, the processing requirements of the proposed regulations are the safest now known to prevent the outgrowth and toxin formation of C. botulinum Type E; and (2) that since the public health hazard of C. botulinum Type E in smoked fish is not restricted to a single species of fish, the conditions of current good manufacturing practice for this industry should be established without further delay.

Therefore, having considered the comments received and other relevant material, the Commissioner concludes that the proposed regulations, with most of the suggested clarifying and technical changes incorporated, should be adopted as set forth below. Accordingly, pursuant to provisions of the Federal Food, Drug, and Cosmetic Act * * * the following new Subpart A is added * * * .

35 Fed. Reg. 17401, 17401 (Nov. 13, 1970).

[19] The majority reads into <u>Nova Scotia</u> a phantom limitation of its holding to what it calls "scientific decision" regulations.  <u>See</u> op. Ct. p. 22 n.3.  But the Second Circuit invalidated the regulation at issue on two separate grounds.  Only

(continued...)

we don't get even one short paragraph--we get *bupkis*.  The IRS ignored

comments that questioned the practical application of the regulation, its clarity,

and special problems it would cause some donors.  I agree that section 553(c)

doesn't require an encyclopedia, but it has to require more than nothing; and

ignoring comments in the preamble is not responding to them.  As Judge Gurfein

wrote in <u>Nova Scotia</u>, 586 F.2d at 252, "[t]he agencies certainly have a good deal

of discretion in expressing the basis of a rule, but the agencies do not have quite

the prerogative of obscurantism reserved to legislatures."

---

[19](...continued)
the first was that "[w]hen the basis for a proposed rule is a *scientific decision*, the
scientific material which is believed to support the rule should be exposed to the
view of interested parties for their comment." <u>Nova Scotia</u>, 568 F.2d at 252
(emphasis added).  But there was a second reason for the court's holding--the
agency had failed to respond to significant comments.  <u>Id.</u>  This part of the opinion
doesn't even invoke the words "scientific decision." <u>Id.</u> at 252-53.  <u>Nova Scotia</u>
cannot so easily be cabined.  <u>See, e.g.</u>, <u>Nutritional Health All. v. FDA</u>, 318 F.3d
92, 94, 98 (2d Cir. 2003) (applying <u>Nova Scotia</u> to a regulation regarding
packaging rules); <u>Nat'l Black Media Coal. v. Fed. Commc'ns Comm'n</u>, 791 F.2d
1016, 1018, 1023 (2d Cir. 1986) (holding that an agency violated <u>Nova Scotia</u>
when it failed to disclose studies and maps it relied on when crafting a regulation
regarding frequency allocations for AM broadcast channels); <u>United States v.
Garner</u>, 767 F.2d 104, 117-18, 121 (5th Cir. 1985) (analyzing a regulation
requiring individuals to refinance their loans under <u>Nova Scotia</u>).

3.

The majority nevertheless says there's enough there to uphold the regulation. It first points us to the preamble to the final regulations, see op. Ct. pp. 19, 25, and insists that "all comments" were considered by Treasury here. But if we look at the notice of the final regulation, we see no meaningful consideration of comments at all.

It is true that Treasury said there that it was adopting the rule "after consideration of *all* comments." 51 Fed. Reg. at 1496 (emphasis added). And before <u>Encino Motorcars</u>, before <u>Chevron</u>, and even before <u>State Farm</u> we *did* reason our way to upholding tax regulations by noting the ritual invocation of this magic phrase. See <u>Wing v. Commissioner</u>, 81 T.C. 17, 31-32 (1983).

But what we never seem to have noticed is how common this statement is. It certainly pops up with startling frequency in the IRS Cumulative Bulletin. <u>See, e.g.</u>, T.D. 8584, 1995-1 C.B. at 21 ("After careful consideration of all the comments"); T.D. 8540, 1994-2 C.B. 297, 297 ("After consideration of all of the comments received"); T.D. 8476, 1993-2 C.B. 13, 14 ("After consideration of the comments"); T.D. 8069, 1986-1 C.B. at 90 ("After consideration of all comments regarding the proposed amendments"); T.D. 8067, 1986-1 C.B. 218, 219 ("After consideration of all comments and testimony received on the proposed

amendments"); T.D. 8075, 1986-1 C.B. 245, 246 ("After consideration of all written comments received"); T.D. 8065, 1986-1 C.B. 254, 254 ("After consideration of all comments regarding the proposed regulations"); T.D. 8081, 1986-1 C.B. 343, 344 ("After consideration of all comments received").

It is as if this phrase is from a form in Treasury's regulation-drafting guide-- which it is. See Internal Revenue Manual pt. 32.1.5.4.7.1(1) (Example 4) (Aug. 21, 2018) ("After consideration of all the comments, the proposed regulations are adopted as amended"). The APA, however, has no provision for agencies to use ritual incantations to ward off judicial review. See Dominion Res., 681 F.3d at 1319 (determining that the agency's statement of "[a]fter careful consideration of all the comments," T.D. 8584, 1995-1 C.B. at 21, was not a satisfactory explanation of its action). The same phrase was used by the Department of Labor when it issued the regulation that the Supreme Court invalidated in Encino Motorcars, 579 U.S. at __, 136 S. Ct. at 2126 ("The Department said that, in reaching its decision, it had 'carefully considered all of the comments, analyses, and arguments made for and against the proposed changes'"). But this makes sense--because if the APA did allow comments to be disregarded with this simple magical phrase as part of a standard form, it would make commenting meaningless. See Sherley v. Sebelius, 689 F.3d 776, 784 (D.C.

Cir. 2012) (indicating that agency action which makes commenting meaningless violates the APA) (citing Home Box Office, 567 F.2d at 35-36).

This was not enough in Encino Motorcars, 579 U.S. at __, 136 S. Ct. at 2127, where the Court observed that "when it came to explaining the 'good reasons for the new policy' * * * the Department said almost nothing."

It should not be good enough for us today.

4.

The majority's final argument on this topic is that Treasury actually did respond to them--not with anything in a statement that accompanied the final rule, but by changing the proposed rule before it went final. See op. Ct. p. 21 ("Treasury *clearly* considered the comments * * * because it *substantially* revised the text [of the regulation] in response to [the] comments" (emphasis added)). This argument, however, was rejected by Federal Circuit in Dominion Resources, 681 F.3d at 1319, and the Second Circuit in Nova Scotia, 568 F.2d at 244, 252-53.

Even if the IRS had been making a pure policy decision with no factfinding needed at all, it would still have had to identify the considerations it found persuasive. Indus. Union Dep't, 499 F.2d at 476. In Ishtyaq v. Nelson, 627 F. Supp. 13 (E.D.N.Y. 1983), for example, the plaintiffs argued that a regulation lacked an adequate "concise general statement." The court disagreed because the

agency had acknowledged the comments, stated its position on the principal objection raised by commenters, and showed why it chose to follow one course of action rather than another. Id. at 21-23.

So this idea that the agency here could respond to significant comments by making only minor changes to the proposed regulation, absent any supplemental explanation, is insufficient as a response to significant comments. But maybe the majority is right and I and the appellate courts are wrong, and a court may infer an agency's reasoned response to a significant comment.

The problem is that even if Treasury could respond in this way to significant comments, it didn't in fact do that here. There *were* changes made to the proposed regulation before it became final--but these changes were far from what the majority describes as "substantially revised" language. A change from a donee's entitlement to extinguishment proceeds that have an FMV that is "a minimum ascertainable proportion of the fair market value to the entire property," 48 Fed. Reg. 22946 (May 23, 1983), to "at least equal to the proportionate value that the perpetual conservation restriction at the time of the gift, bears to the value of the property as a whole at that time," 51 Fed. Reg. 1496, 1505 (Jan. 14, 1986), has no obvious explanation other than to increase editorial clarity. And the second change that the Commissioner and majority point to--going from "original

proportionate value" to "that proportionate value"--seems entirely editorial. The majority implies that these changes are substantial, yet one would be hard pressed to think of any set of facts in which the changed language would change the outcome in any particular case.

The Supreme Court in Encino Motorcars, 579 U.S. at __, 136 S. Ct. at 2126, invalidated a regulation from an agency that offered "barely any explanation." Here we have none. We should, therefore, hold that Treasury's failure to respond to significant comments in the Final Rule's statement of basis and purpose violated APA section 553(c). That is reason enough to hold section 1.170A-14(g)(6)(ii), Income Tax Regs., invalid under APA section 706(2)(D). To do otherwise would be to hold that "the opportunity to comment is meaningless." Home Box Office, 567 F.2d at 35.

## III.

There's another problem with our opinion. Even if this regulation were to be procedurally valid, it might well be substantively invalid. Oakbrook argued in

its original posttrial briefs that we should use the <u>Chevron</u> two-step.[20]  The

Commissioner agreed, and the majority tags along.  <u>See</u> op. Ct. p. 26.

Under this familiar standard, courts defer to an agency's reasonable

construction of an ambiguous statute that Congress has tasked the agency with

administering.  <u>Chevron</u>, 467 U.S. at 843-44.  At the first step, courts employ

"traditional tools of statutory construction" to determine whether "Congress has

directly spoken to the precise question at issue."  <u>Id.</u> at 842, 843 n.9.  If it has, the

statute is unambiguous, and we apply it as written; for "that is the end of the

matter."  <u>Id.</u> at 842.  But "if the statute is silent or ambiguous with respect to the

specific issue," we move to the second step, which asks "whether the agency's

answer is based on a permissible construction of the statute."  <u>Id.</u> at 843.  Where

"Congress has explicitly left a gap for the agency to fill" by regulation, we defer to

the agency's construction unless it is "arbitrary, capricious, or manifestly contrary

to the statute."  <u>Id.</u> at 843-44.  As a trial court, it's not up to us to challenge the

<u>Chevron</u> standard, but the majority should have at least acknowledged that there

_____

[20] After the Fifth Circuit's decision in <u>PBBM-Rose Hill</u>, 900 F.3d 193, and the realization that this case was the first to challenge the regulation's validity, we ordered production of the administrative record of the regulation's origin and gave the parties the opportunity to file another round of briefs to make any arguments on the regulation's validity that they wanted to preserve.

are contrary positions about whether <u>Chevron</u> supplies the only standard of review.

This is especially true because Oakbrook now also relies on <u>State Farm</u>. In that case, the Supreme Court was asked to determine whether an agency's decision to rescind a regulation was arbitrary and capricious. <u>State Farm</u>, 463 U.S. at 34. In holding that it was, the Court established four factors that courts might consider in determining whether an agency action is deficient, and stated:

> Normally, an agency rule would be arbitrary and capricious if the agency has [(1)] relied on factors which Congress has not intended it to consider, [(2)] entirely failed to consider an important aspect of the problem, [(3)] offered an explanation for its decision that runs counter to the evidence before the agency, or [(4)] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

<u>Id.</u> at 43.

So how do we review the substantive agency action? Well, the relationship between <u>State Farm</u> and <u>Chevron</u> is less than clear right now.[21] <u>State Farm</u> is still

---

[21] One thing we do know is that courts analyze the validity of regulations under <u>State Farm</u> even where the regulation does not "reverse[] an earlier policy supported by a body of fact." <u>Compare</u> op. Ct. p. 19 n.2, <u>with</u> <u>Fed. Energy Regulatory Comm'n v. Elec. Power Supply Assoc.</u>, 577 U.S. __, __, 136 S. Ct. 760, 771-72, 782-84 (2016) (<u>State Farm</u> review of a regulation that didn't reverse policy); <u>Bowen v. Am. Hosp. Ass'n</u>, 476 U.S. 610, 613-17, 626-42 (1986) (same); <u>Atrium Med. Ctr. v. HHS</u>, 766 F.3d 560, 567 (6th Cir. 2014) (same); <u>and</u> <u>All. for Comty. Media v. FCC</u>, 529 F.3d 763, 769, 786-87 (6th Cir. 2008) (same).

the go-to standard for challenges to a regulation's validity on the ground that it is arbitrary and capricious under the APA, while <u>Chevron</u> (particularly step two) is principally used for challenges to a regulation's validity on the ground that it is unreasonable. In recent years the line between <u>State Farm</u> and <u>Chevron</u> step two has blurred. <u>See</u> <u>Judulang v. Holder</u>, 565 U.S. 42, 52 n.7 (2011) ("[The] analysis would be the same, because under <u>Chevron</u> step two, we ask whether an agency interpretation is 'arbitrary or capricious in substance'"). In a case appealed to the Ninth Circuit, we ourselves held that "regardless of the ultimate standard of review--the final rule must satisfy <u>State Farm</u>'s reasoned decisionmaking standard." <u>Altera Corp. v. Commissioner</u>, 145 T.C. 91, 117 (2015), <u>rev'd</u>, 926 F.3d 1061 (9th Cir. 2018), <u>petition for hearing en banc denied</u>, 941 F.3d 1200 (9th Cir. 2019), <u>petition for cert. filed</u> No. 19-1009 (Feb. 13, 2020).

But not all courts agree. The Second Circuit, for example, held that the district court's application of the <u>State Farm</u> standard at <u>Chevron</u> step two was reversible error: "While we have great respect for the district court's careful and searching analysis * * *, we conclude that it erred by incorporating the <u>State Farm</u> standard into its <u>Chevron</u> Step Two analysis and thereby applying too strict a standard of review." <u>Catskill Mountains Chapter of Trout Unltd., Inc. v. EPA</u>, 846

F.3d 492, 521 (2d Cir. 2017).  A brief survey of the other circuits since Judulang

shows just how unsettled this question remains:

- Craker v. DEA, 714 F.3d 17, 26 (1st Cir. 2013) (even if agency's statutory interpretation satisfies Chevron, it may still be set aside as arbitrary and capricious under State Farm);

- Almy v. Sebelius, 679 F.3d 297, 302 (4th Cir. 2012) (Chevron operates "[i]n addition to" State Farm);

- Sw. Elec. Power Co. v. EPA, 920 F.3d 999, 1028 (5th Cir. 2019) (Chevron step two and the APA share the arbitrary and capricious standard and the analysis under the two standards proceeds similarly) (citing Richard J. Pierce, Jr., Administrative Law Treatise, sec. 3.6 (5th ed. 2010) (suggesting that Chevron step two has "complete overlap" with the APA and State Farm if rule challenged as "unreasonable"));

- Abraham Lincoln Mem'l Hosp. v. Sebelius, 698 F.3d 536, 547 (7th Cir. 2012) (suggesting a distinction between arbitrary-and-capricious review under State Farm and Chevron step two);

- Altera, 926 F.3d at 1075-76 (adopting Second Circuit analysis of Catskill Mountain); but see Turtle Island Restoration Network v. United States Dep't of Commerce, 878 F.3d 725, 732-33 (9th Cir. 2017) (Chevron step two equivalent to the State Farm arbitrary-and-capricious review);

- Nutraceutical Corp. v. Von Eschenbach, 459 F.3d 1033, 1037-38 (10th Cir. 2006) (suggesting overlap between State Farm's arbitrary and capricious standard and Chevron step two); see also Gutierrez-Brizuela v. Lynch, 834 F.3d 1142, 1149-58 (10th Cir. 2016) (Gorsuch, J., concurring) (questioning the constitutionality of Chevron);

- Nat'l Mining Ass'n v. Sec'y, U.S. Dep't of Labor, 812 F.3d 843, 865 n.23 (11th Cir. 2016) (Chevron step two functionally equivalent to arbitrary and capricious review under the State Farm);

- Sorenson Commc'ns, LLC v. FCC, 897 F.3d 214, 230 (D.C. Cir. 2018) (identifying significant overlap between Chevron step two and State Farm); and

- Balestra v. United States, 803 F.3d 1363, 1368 n.2 (Fed. Cir. 2015) (State Farm often overlaps with analysis under Chevron step two, but the two standards should be applied separately).[22]

Because this case is appealable, absent stipulation to the contrary, to the Sixth Circuit, I would follow its approach. See Golsen v. Commissioner, 54 T.C. 742, 756 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971). That approach is to analyze challenges to a regulation under Chevron step two and State Farm independently. See Atrium Med. Ctr., 766 F.3d at 567 ("Even if an agency's statutory interpretation is permissible under Chevron * * *, the agency's action may still be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting APA sec. 706(2)(A))); see also Nat'l Truck Equip. Ass'n v. Nat'l Highway Traffic Safety Admin., 711 F.3d 662, 668-69 (6th Cir. 2013).

The goal of review under either APA section 706(2)(A) or (D), and under Chevron or State Farm is to ensure that an agency engages in reasoned decisionmaking. According to the Sixth Circuit, "[a]t base, arbitrary and

---

[22] The Third and Eighth Circuits seem not to have considered this question.

capricious review functions to 'ensur[e] that agencies have engaged in *reasoned decisionmaking*.'" Atrium Med. Ctr., 766 F.3d at 567 (emphasis added) (quoting Judulang, 565 U.S. at 53). Reasoned decisionmaking means that the agency "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." State Farm, 463 U.S. at 43 (internal quotation marks omitted); see also APA sec. 553(c).

Oakbrook argues that the regulation is arbitrary and capricious under the APA and the State Farm standard, and the Commissioner just as plainly defends the regulation as reasoned decisionmaking. The majority today doesn't even address this argument; it should have. And following the Sixth Circuit's lead, we should run this regulation not only through Chevron but through State Farm too.

As to how this regulation fares under Chevron, I agree with the majority that "perpetuity" allows for a wide range of possible interpretations; it certainly doesn't by itself show Congress spoke on the issue of preserving the conservation purposes of a donated easement that has been extinguished or condemned. That's enough to skip past step one.

The problem is with step two, and it affects both the "proportionate value" and "donee improvements" parts of the challenged regulation. The majority finds

the regulation reasonable in requiring a proportionate split of the proceeds from an easement's extinguishment because "considerable inflation in property values might occur in the interim." See op. Ct. p. 28. It similarly finds the regulation's ban on reducing the donee's share of proceeds to account for improvements reasonable because "[i]n certain factual scenarios, reducing the donee's proceeds on account of donor improvements could frustrate this goal, especially if local land values should decline." See id. p. 29.

These seem like perfectly plausible reasons. But they are not the ones that Treasury itself offered at the time it issued the regulation. This raises another problem for the Commissioner in his defense--the Chenery rule. The Chenery rule prevents an agency from relying on *post hoc* rationalizations to defend its decisionmaking. SEC v. Chenery Corp., 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."); see also State Farm, 463 U.S. at 50 (courts may not accept post hoc rationalizations). And Chevron step 2 is limited by Chenery. Bank of Am., N.A. v. FDIC, 244 F.3d 1309, 1319 (11th Cir. 2001) (stating that Chenery must be considered at step 2 of Chevron); see also Council for Urological Interests v. Burwell, 790 F.3d 212, 222 (D.C. Cir. 2015); America's Cmty. Bankers v. FDIC, 200 F.3d 822, 835 (D.C. Cir. 2000). We shouldn't be

coming up with our own *post hoc* justifications for the reasonableness of the rule if the Commissioner's lawyers wouldn't be able to.

The same problem affects our analysis of the substantive validity of this regulation under State Farm. The Sixth Circuit has warned agencies that its arguments in favor of a regulation not being "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" is likewise limited by the Chenery rule. See Atrium, 766 F.3d at 567-68 ("[T]he ground upon which an administrative order must be judged are those upon which the record discloses that its action was based." (quoting Chenery, 318 U.S. at 87)).

The majority today comes up with as good a set of arguments as possible to justify the reasonableness of the regulatory choices that Treasury made when it was drafting this regulation. But Treasury didn't make them. Or at least it didn't make them in the administrative record of this regulation.

IV.

I will end with where I began in today's Memorandum Opinion on the less controversial parts of this case: Conservation-easement cases might have been more reasonably resolved case-by-case in contests of valuation. The syndicated conservation-easement deals with wildly inflated deductions on land bought at much lower prices would seem perfectly fine fodder for feeding into a valuation

grinder. Valuation law is reasonably well known, and valuation cases are exceptionally capable of settlement.

Congress, however, enacted these sections of the Code and presumably wanted reasonably valued conservation easements to be allowed. Yet we've come to a point where we are disallowing a great many conservation-easement deductions altogether, not for exaggeration of their value or lack of conservation purpose, but because of very contestable readings of what it means for an easement to be perpetual. We did defuse the Commissioner's thermonuclear-bomb of an argument that the retained power of parties to any contract to modify its terms meant that no easement anywhere at any time could ever preserve its conservation purpose "in perpetuity." Pine Mountain, 151 T.C. at 280-82. But our agreement with the Commissioner in Pine Mountain last year that a reserved right to build a home on property subject to an easement is defeated if its location is not precisely defined will lead, at best, to a circuit conflict that the Supreme Court will have to resolve.[23]

_____

[23] One can even foresee a conflict between the acceptable power to amend and the unacceptable "floating homesite" provision: Imagine the case where a general provision in an easement deed allows for amendments so long as the donee finds that the conservation purpose is preserved, but has no express provision that allows the donor to add improvements except to build a single home in a location fixed with extreme precision by the deed. Years pass, it comes time

(continued...)

Today we uphold a regulation that will invalidate who knows how many other conservation-easement deductions, and will almost certainly lead to appeals in multiple circuits. If the Commissioner continues to seek gross-misvaluation penalties, we will also have to figure out in a great many cases how to determine which portion of an underpayment is attributable to a valuation misstatement and which is due to a failure of the conservation easement altogether, when it might justly be said to be attributable to both. See PBBM-Rose Hill, 900 F.3d at 214.

I fear that our efforts to clear cut and brush hog our way out of the volume of conservation-easement cases we have to deal with has left us a field far stumpier than when we began.

I respectfully dissent.

---

[23](...continued)
to build, but in building the donor discovers a sinkhole on the edge of the building area, making it unbuildable. He determines he could avoid the sinkhole by shifting the location of the building area one foot from its original location. With the donee's permission, he amends the deed, as is his right under the general amendment provision, to shift the boundary of the building area. Why this deduction would be allowable, while another in which a deed of easement expressly permits a donor to shift the location of the building area with the same required permission and preservation of conservation purpose, is not obvious.